13920

SUGGS v. NEW YORK LIFE INS. CO.

(176 S. E., 457)

*Messrs. Thomas, Lumpkin & Cain* and *McDow & Hildebrand,* for appellant,

*Messrs. Hart & Moss,* for respondent,

October 9, 1934.

The opinion of the Court was delivered by MR. JUSTICE STABLER.

The facts out of which this action arose, as well as the questions involved in the appeal, are fully set out in the opinion of Mr. Justice Bonham, and will not be restated here.

I think that Judge Townsend properly submitted the case to the jury. As indicated by him, in refusing defendant's motion for a directed verdict, it was for that body to say, under the evidence, whether the answers of Suggs to the questions asked in the application for insurance were made by him with intent to deceive and defraud the company.

In *Johnson v. New York Life Insurance Company*, 165 S. C., 494, 164 S. E., 175, 177, the Court said: "Finally, the intent with which representations or misstatements of facts are made is a thing that is locked up in the heart and consciousness of the applicant. It may be shown by his express words, or it may be deduced from his acts and the facts and circumstances surrounding the making of the misrepresentations, *though on this question the mere signing of the application containing the answers alleged to be false is not conclusive. Huestess v. Insurance Co.*, 88 S. C., 31, 70 S. E., 403." (Italics added.)

In that case, Johnson stated in his application that he did not drink spirits or other intoxicants in any quantity at all, and that he had taken only an occasional drink in the past. The undisputed testimony, as stated in the opinion, disclosed that, during the five years immediately preceding the signing of the application, the insured had been treated by his

physician for alcoholism on ten different occasions, on one of which he was confined to a hospital; that some of such periods of illness would last from one to four weeks; and that he was advised by one of the attending physicians to discontinue the use of alcohol, as the doctor thought it would ruin his health. The Court held: "Under the circumstances of this case, we do not see how any reasonable inference as to the applicant's intent in making his answer to the questions under consideration could be drawn from the undisputed facts other than that he deliberately intended to deceive the company and thereby procure the insurance."

I do not think that it can be said, from an analysis of the testimony in the case at bar, that no inference can be drawn from the evidence other than that Suggs "deliberately intended to deceive the company and thereby procure the insurance."

Dr. Neil, a witness for the defendant, testified that he had examined Mr. Suggs as far back as 1928 and found that he had an enlarged thyroid gland, and that there were present the attendant symptoms of that trouble, such as too rapid action of the heart and high blood pressure; that he told him he should have the gland removed, as its condition might affect his health; that in 1930 he attended Mr. Suggs for acute bronchitis, but did not then notice any of the conditions which were present in 1928; that after the insured was operated on by Dr. Benizer in 1932, the witness called at his home frequently and found that his heart action was normal and his blood pressure practically so; that he stated in the proofs of death that the insured had died from angina pectoris, but that he desired to change that to thrombosis of the coronary artery, which disease is slightly different from that of angina. He further testified that Mr. Suggs recovered entirely from his attack of bronchitis, and that the witness would have recommended him for insurance after the removal of the goiter, upon "a reasonable observation"; and he did not think that "the goiter trouble" caused the death of the insured.

Dr. McGill stated that he made an examination of Mr. Suggs on June 21 and 22, 1931, about three weeks before the application for insurance "was finished up," the patient being under the impression that he had indigestion; that from his diagnosis the witness concluded that the trouble was hyperthyroidism, "a condition of the result of the disease of the thyroid gland"; that he had rapid heart action and high blood pressure, both of which were symptoms of the trouble; and that he told the patient about his heart action but did not recall that he said anything to him concerning his thyroid condition.

Dr. Benizer, witness for the plaintiff, testified that he specialized in goiter work; that Mr. Suggs came to him on April 3, 1932—which was about eight months after the policy of insurance was issued—and that he found his trouble to be hyperthyroidism, with the attendant symptoms of fast and irregular heart, high blood pressure, loss of weight, etc.; that he removed the goiter, after which there was a rapid improvement, the various symptoms mentioned disappearing, his blood pressure going down to 140 and his pulse down to 80; that he was dismissed from the hospital in five days after the operation, but returned three weeks later to be looked over; that it was found that he had made a rapid recovery, his condition being excellent, and witness had every reason to believe that he would soon be well. The doctor further testified that later, about May 16, a little over a month after the operation, he was called to Mr. Suggs and found that "his left lung was filled; he had a temperature about 102. A large part of his left lung, certainly the lower left, was solid. He was having a good deal of trouble with his breathing. And at that time, this was a terminal pneumonia." He also stated that Suggs got that way very suddenly, and that the witness saw no signs or symptoms of such condition when the insured returned to the hospital after the operation.

The plaintiff, wife of the insured, stated that no doctor had been called to her husband from 1928 to 1931, except

one time when he had indigestion and another when he had an attack of bronchitis. Also, during the period named, he appeared to be in good health, made no complaint about his physical condition, and attended strictly to his business.

Mr. Patterson, Presbyterian minister, in whose church Suggs was an elder, testified that the insured's reputation for truth, fair dealing, and honesty was good. Two other witnesses testified to the same effect. Also, the agent of the company who took the application for the insurance stated that he had known Mr. Suggs for about five years; that he was president of the Bank of Clover, and apparently attended regularly to his business; that he "looked healthy enough"; that his reputation for truth and honesty in the community was good; and that the witness, so far as he knew, had no reason to change his opinion. Testimony as to the reputation of the deceased for truth and honesty, while objected to, was properly allowed by the Court to go to the jury for their consideration in determining the question of whether the insured by his answers intended to practice fraud upon the company in securing the insurance. *Wingo v. Life Insurance Company,* 155 S. C., 206, 101 S. E., 653; *Rogers v. Insurance Company,* 135 S. C., 89, 133 S. E., 215, 45 A. L. R., 1172.

In the *Johnson case, supra,* the following observation is found: "We recognize that, ordinarily, the question of fraud in a case of this kind is for the jury, but we feel that this is one of those rare cases in which the undisputed facts can reasonably give rise to only one inference, namely, that the policy was procured by fraud."

As stated by the Court, there are some "rare cases," such as the *Johnson case,* where the only reasonable inference to be drawn from the evidence is that the policy was obtained by deceit, but, as also pointed out, the issue of fraud in a case of this kind is usually for the jury, and the mere signing of the application is not conclusive of the question.

Applying these principles to the facts of the case at bar, I see no error in the refusal of Judge Townsend to direct a

verdict for the defendant. The evidence does not show that the applicant knew or believed that he was seriously ill, and his reputation for honesty and fair dealing, if the witnesses were to be believed, was never questioned. Undoubtedly, in the light of these facts and circumstances, it was for the jury and not for the Court to determine the issue made.

The judgment below is affirmed. ·

MR. CHIEF JUSTICE BLEASE concurs.

MR. JUSTICE CARTER concurs in result.

MR. JUSTICE BONHAM and MR. ACTING ASSOCIATE JUSTICE W. C. COTHRAN dissent.

MR. JUSTICE BONHAM (dissenting): July 16, 1931, Arthur Mason Suggs made application to New York Life Insurance Company for a policy of insurance on his life in the sum of $2,000.00 with Olive J. Suggs, his wife, as beneficiary. The policy was issued and delivered August 13, 1931. The first premium in the sum of $85.58 was duly paid. Arthur M. Suggs died May 18, 1932. The company denied liability, and this action was begun December 3, 1932, and was heard by Judge W. H. Townsend, with a jury, at the April, 1933, term of the Court of Common Pleas for York County, and resulted in a verdict for the plaintiff.

·The complaint alleges the facts hereinabove set forth.

The answer admitted the execution and delivery of the policy and payment of the first premium, and admitted the formal allegations of the complaint. It denies liability on the ground· of fraud by the insured in procuring the insurance, which renders the policy null and void. The answer further alleges that the insured, Arthur Mason Suggs, appeared before defendant's agent and made and signed a declaration in reference to his past health, habits, and consultation with physicians, in which he stated over his signature that all the answers made by him were true. He stated in this application that he was then, and, for the past five years had been, continuously in good health; that he didn't then have, had never had, and never had been told that he had, any of the various diseases inquired about in the application, including

high blood pressure, heart trouble, kidney trouble, paralysis, and that he had not within five years had any ailment, disease, or impaired condition of body or mind, and within five years had not consulted, been examined, or treated by any physician; he further declared that he had read each and all of the answers, that each of them was written by him, and that each of them was "full, complete and true," and he agreed that "the Company believing them to be true shall rely and act upon them." That upon receipt of the purported proofs of death, defendant made an investigation which led it to believe that the insured had made untrue statements in his application for insurance. From the proofs of death and the investigation it was ascertained that within five years preceding the application the insured had not been continuously in good health and had not been told that he had high blood pressure, heart trouble, kidney trouble, bronchitis and paralysis, and had, within the five years preceding the application, consulted or been treated by physicians; that he did not disclose these facts in his application; that within the five years he had suffered from high blood pressure, kidney trouble, paralysis, and other ailments, and consulted and been treated by Dr. M. B. Neil, Dr. Pressly, Dr. W. K. McGill, and possibly others. It is further alleged that the contract of insurance was not a valid contract and did not take effect upon its delivery because of the fraudulent statements and concealments, as set forth in the answer; that upon discovery of these things defendant tendered to the plaintiff, who is the beneficiary named in the policy, the return of the amount of the premium which had been paid it, with interest thereon, to wit, $90.70, and advised plaintiff that it elected to rescind the contract. The tender was refused, and defendant brings the sum into Court to be held by the Court for the benefit of the plaintiff.

The defendant, upon the close of the testimony, moved for the direction of a verdict in its favor, which motion was denied.

From the judgment entered on the verdict for plaintiff, the defendant appeals upon exceptions which need not be specifically discussed, which will be fully considered and determined.

This policy is peculiar for the reason that the policy of insurance was issued upon an application by the insured in which he wrote with his own hand the answers and statements therein, and no medical examination was made.

It is stated in 14 R. C. L., 1023, upon the authority of the United States Supreme Court in the case of *M'Lanahan v. Universal Insurance Co.*, 1 Pet., 170, 7 L. Ed., 98, that: "A contract of insurance has been said to be a contract *uberrimae fidei.*"

Cochran's Law Lexicon defines contracts *"uberrimae fidei"* to be: "Contracts made between persons in a particular relationship of confidence, as guardian and ward, or attorney and client, requiring the fullest information to be given beforehand by the person in whom the confidence is reposed to the person confiding, and perfect fairness in all dealing, or the Court will refuse to enforce the contract in favor of the former."

That definition of an insurance contract applies with peculiar force and aptness to a contract like this, in which the insurance company has dispensed with a medical examination of the applicant and put him on honor to make truthful answers to all questions propounded by the application, and to make full disclosure of all things touching his health and the attendance of physicians and consultations with them.

The defendant denies liability because it alleges that the insured did not make truthful answers, and did not make the full disclosures which fair dealing and the confidence reposed in him required him to do. Over his own signature, the applicant for insurance declared that he had carefully read each and all of the answers he had made, and which he wrote, "and that each of them is full, complete and true," and he

agreed that "The Company believing them to be true shall rely and act upon them."

In the case of *Johnson v. Ins. Co.*, 165 S. C., 499, 164 S. E., 175, 176, Mr. Justice Stabler, delivering the opinion of this Court, said: "It would be necessary for the defendant to show that the statements in the application relied on to defeat the policy were untrue, that their falsity was known to the applicant, that they were material to the risk and relied on by the insurer, and that they were made with intent to deceive and defraud the company."

We will apply that yardstick to the present case.

Were the statements in the application upon which defendant relies in denying liability, untrue? Let us recount the facts leading up to the issuance and delivery of the policy:

The application was made July 16, 1931; the policy was issued August 13, 1931. April 3, 1932, the insured was examined by Dr. Benizer, and a few days thereafter underwent an operation. May 16, 1932, he died.

In his application, the insured was called upon to answer this question: "Have you now, or have you ever had, or ever been told that you had   *   *   *   high blood pressure, heart trouble   *   *   *   disease of brain or nervous system, paralysis.   *   *   *?" He answered: "No."

He was asked to state: "Each ailment, disease, impaired condition of body or mind, surgical operation or injury which you have had within the past five years, and the name of every physician or practitioner, if any, whom you have consulted, or who treated you." He answered: "None."

He was asked: "What physicians or practitioners, if any, not named above, have you consulted, or been examined or treated by within the past five years?" He answered: "None."

Were those statements untrue?

Dr. M. B. Neil, a witness for defendant, testified that the insured came to him at his office in 1928 and asked for an examination, which he gave him; he says he found that

Mr. Suggs had a blood pressure of 180; that he had a kind of facial paralysis; and an enlarged thyroid gland, which causes exophthalmia; his eyeballs protruded, which is a symptom of goiter; he was some nervous; that applies to goiter; his pulse was about 90 and rapid.

Dr. W. K. McGill, a witness for defendant, testified: That Mr. Suggs "called me twice, June 21 and 22, 1931; he was complaining of a severe pain and burning sensation in the region of his stomach. I took his blood pressure, it was 180." Asked what was his diagnosis of his condition, he said: "I would hardly like to have made the diagnosis from one examination, but my impression was heart trouble and hyperthyroidism. * * * Hyperthyroidism is a condition of the result of the disease of the thyroid gland, as the doctor before explained to you, like, to the front and base of the neck and body." "To relieve his pain I gave him a hypodermic of morphine; this was the night of June 21st. His pulse was 108; anything over 88 means trouble." The witness was asked: If a man in 1928 had blood pressure 180, and in 1931 still had blood pressure 180, and in 1932 still had a blood pressure of 180, would that be considered by the medical profession a serious ailment, symptom and condition of the human body? He answered: "It would be so considered, yes." "The pulse was 108?" "Yes." "Is that a serious condition, Doctor?" "Yes, sir." "Was the patient nervous at the time you saw him?" "Yes, sir, he was nervous. Nervousness and rapid heart action are symptoms of thyroid condition."

Dr. A. G. Benizer, witness for the plaintiff and who performed the operation for thyroid gland trouble, examined him April 3, 1932, some six weeks before he died. He testified: "Mr. Suggs was 47 years old at that time. And the diagnosis made for thyroid toxemia, hyperthyroidism condition, you call exophthalmia; goiter * * *. His complaint was a fast and irregular heart, loss of weight, nervousness and weakness, pain and burning in the upper part of

his abdomen, shortness of breath. * * * And he had a fast and irregular heart, high blood pressure, loss of weight, nervousness and weakness and burning in his upper abdomen —Epigastric; he had pain in his side at that time."

It is true that his examination was made some eight months after the application was made, but the medical testimony clearly shows that the conditions which Dr. Benizer found to exist on April 3, 1932, existed July 16, 1931, when the application was signed by Mr. Suggs.

It must be conceded that the representations in the application upon which defendant bases its denial of liability was untrue. The applicant was not in sound health. He had high blood pressure, heart trouble, facial paralysis and exophthalmia, goiter, and he had consulted and been treated by physicians although he said he had not.

Did the applicant know that they were untrue?

Dr. Neil testified that in 1928, Mr. Suggs, then about 45 years old, came to him and asked that he be given a physical examination. One naturally asks why a man of middle age, of robust and healthy appearance, seeks a physical examination unless he knows or suspects that he has some physical ailment or disease? The doctor was asked: "State whether or not you told Mr. Suggs at that time about his high blood pressure." A. "I told him, yes." "State whether or not you told him about the goiter." "I told him he should have it looked after. * * * The way I told him he had enlarged thyroid gland and rapid heart, and protruding eyeballs, which was a condition which might affect his health, and he should have it removed." The witness saw him again in 1930; he had bronchitis. The witness further said that the operation in 1932 was for the same trouble he had diagnosed in 1928.

Dr. McGill testified: "Did you attempt to tell him what you found, or what, in your opinion, he was suffering from?" A. "I recall discussing with him his rapid heart but I didn't go farther with him than that."

On cross examination, Dr. McGill was asked if he had communicated to Mr. Suggs the thyroid condition and heart action and so on; the doctor answered that he had told him his heart was rapid; he was asked to give his exact words, and answered: "I asked him how long he had had this rapid heart, or thought he had it, and he said he had known his heart was rapid before this."

This statement was made to Dr. McGill less than a month before Mr. Suggs made the representation in his application that he had never had, and had never been told that he had, any heart trouble. Here is the positive testimony of two reputable physicians, which is undisputed, that they informed Mr. Suggs that he had high blood pressure, and heart trouble induced by thyroid gland trouble—goiter.

Moreover, it is inconceivable that a man of the reputed intelligence of Mr. Suggs, seeing in his mirror his protruding eyes, and suffering the hot burning pains of his abdomen, and feeling his nervousness and weakness, did not know that he had physical and bodily ailments of a more or less serious nature at the time when in his application for insurance he said he had not had such infirmities within the space of five years. It is a safe inference that a man of his acute mind would not have sought advice as to the cause of his pains and his nervousness and his weakness, unless he apprehended that there was something wrong.

We think the record establishes beyond question that the insured knew when he made the application that the statements now under discussion were untrue.

Were the statements relied on to defeat recovery material to the risk and were they relied on by the insurer?

It would seem that the insured has, in his application, answered both parts of this double question in the affirmative. He made in writing and signed the following declaration in his application:

"On behalf of myself and of every person who shall have or claim any interest in any insurance made hereunder, I de-

clare that I have carefully read each and all of the above answers, that they are written as made by me, and each of them is full, complete and true, *and agree that the Company believing them to be true shall rely and act upon them."* (Italics added.)

An application for insurance is but a proposal by the applicant to purchase protection under the guise of a contract of insurance to be made with the insurance company. The company may reject or accept the proposal. This would be a contract *uberrimae fides,* and it is the duty of the applicant to give to the company every fact material to the risk. What representations or warranties are material?

"A fact is material where the knowledge or ignorance of it will materially influence the judgment of the underwriter as to whether he will enter into the contract, or in estimating the degree and character of the risk, or in fixing the rate of premium." 32 C. J., § 486, p. 1271.

"Where the policy contract provides that it shall be void if the statements in the application are untrue in any particular which would have led to the rejection of the risk, had they been in accordance with the facts, any material misrepresentations, whether intentional or otherwise, will avoid the contract. So where the provision is that the policy will be void if any of the statements, representations or answers in the application are not full and complete, the answers must be *true in fact* and not merely true according to the belief and understanding of insured." (Italics added.) 32 C. J., pp. 1287, 1288, § 513.

"The falsity of a mere representation will not avoid the policy, unless the representation is as to a material matter. A material matter is one which probably will affect the decision of the company as to the making of the contract, or as to its terms. The question of what is a material matter is not affected by the causes which led to the loss. *A representation may be made material by the agreement of the*

*parties, as where it is stipulated that the policy shall be void in the case of any misrepresentation whatever."*

*"The fact that the company makes a specific inquiry of insured as to a particular matter establishes its materiality. Although the answer to a question asked by insured may not be material in itself, it may be rendered material by the fact that the effect of the answer is to prevent the company from pursuing his inquiry as to the material matters."* (All italics added.) 32 C. J., pp. 1288, 1289, § 514.

The insured represented in his application that he was in good health and had been for five years; that within that time he had not consulted or been treated by a physician or practitioner, and agreed that the company should rely upon those statements. The record shows that within that time he had consulted and been treated by two physicians, that within that time he had had high blood pressure, exophthalmia, or goiter, heart trouble, facial paralysis, bronchitis, and burning sensations in the stomach.

"The insured's statement that he had received no medical treatment of 'any kind' within a year preceding his application for reinstatement has been held a false representation which was material and avoided the policy, where it appeared that he had been treated by a doctor twice during the month immediately preceding his application, and that he was suffering from a variety of ailments at the time, and took the doctor's prescription for them." *Tunnard v. Supreme Council, R. A.,* 201 App. Div., 746, 194 N. Y. S., 707.

In the case of *Minsker v. John Hancock Mutual Life Ins. Co.,* 254 N. Y., 333, 173 N. E., 4, 81 A. L. R., 829, it is said: "Representations in an application for life insurance that the applicant has had no medical attention in the five years preceding and has never received or applied for treatment at any hospital, dispensary, sanitarium, cure, or other institution, are material to the risk, so that their falsity invalidates the policy."

Much testimony was taken in the present case to show that the ailments and diseases for which the insured was examined, treated, and operated upon were not of a serious nature, would not produce death. We ascribe little importance to the scope of this testimony, but even by that it appears that the ailments were of such nature as to affect the risk, and were therefore material and the company was entitled, in good faith, to be advised of them.

Dr. Neil was asked: "Would you have recommended a man for insurance with a blood pressure of 180?" He answered: "No."

In the proofs of death, sent in by the plaintiff and signed by Dr. Neil, the question was asked: "What disease was the immediate cause of death?" The answer was: "Angina Pectoris," which is well known to be a heart trouble, and there is ample testimony in the record that the insured had heart trouble. This witness testified also that high blood pressure (180), if extended over a long period, would produce hardening of the arteries and probably produce death.

Dr. McGill was asked if blood pressure of 180 was a serious symptom of trouble, physical trouble. He answered: "Anything above 150 is considered by us abnormal—above normal. But his was considered extraordinary by the medical profession, unless it is amenable to treatment."

Dr. McGill was further asked, if a man had a blood pressure of 180 in 1928, 1931, and 1932, "would that be considered by the medical profession as a serious ailment, symptom, and condition of the human body?" "It would be so considered, yes." He said also: "Blood pressure raised over a length of time, like this, is calculated to produce other damages to the human system."

Dr. Benizer, a witness for plaintiff, and who operated on Mr. Suggs, was asked: "In your opinion did he not die from goiter, or from the effects of goiter?" He answered: "Hyperthyroidism, of course, is one of the damaging conditions of the heart."

This witness also testified that high blood pressure of 180, a showing of an enlargement of the thyroid gland, and nervousness continued over a period of four years would tend to break down the human system.

"A representation is material when the insured knows, or has reason to believe, that it will be likely to influence the insurance company either in fixing the amount of premium or in rejecting the risk altogether." *Johnson v. Insurance Co., supra.*

We think the record establishes that the answers and concealments upon which the appellant company relies to justify its claim of right to rescind the contract of insurance were material to the risk.

Did the company rely upon them in accepting the risk?

Edith Decker, a witness for defendant, testified that she was a clerk in the office of New York Life Insurance Company; that her duties were to pass upon applications for life insurance from the medical standpoint where no medical impairment appears in the papers; that she passed upon the application of Arthur M. Suggs; that while testifying she had before her the file in the case; that she approved the application. She was asked: "In approving the application, on what did you rely?" A. "I relied on the statements and answers made by Mr. Suggs in his application for insurance, particularly those appearing in Part II of the application; I also relied on the agent's report." She was asked if she believed the statements and answers made by Mr. Suggs, and had no reason to believe that any of them were incomplete or untrue. She answered that she did believe them and had no reason to doubt them. She was asked if, while considering Mr. Suggs' application, she had known through disclosures made by Mr. Suggs in his application, or through any other source, that Mr. Suggs had been in poor health during the five years preceding his application, what action she would have taken. She replied: "I would have referred it to the Medical Board"; that in such case she would not have been

authorized to approve it; that if she had known from the application, or other source, that Mr. Suggs had been under the treatment of physicians during the five-year period preceding the application, she would not have been authorized to approve the application.

Ralph H. Bowles, a witness for defendant, testified that he is a member of the classification committee of the New York Life Insurance Company. His duties are to consider and pass upon applications for life insurance after they have been acted upon from a medical standpoint. He approved the application of Arthur M. Suggs, basing his approval upon the medical approval of Miss Decker, and on all the statements and answers made by Mr. Suggs in his application, and on the agent's report. He believed the answers of Mr. Suggs to be true; had no reason to believe that they were incomplete or untrue. If the application had disclosed that Mr. Suggs had been in poor health during the period of five years preceding his application, or that he had been treated by physicians during that period, he would not have approved the application pending further consideration of the matter by a member of the Medical Board at the home office; in this case had a medical history appeared, the case would have been referred to the Medical Board for an opinion before any policy was issued.

Dr. Robert A. Fraser, a witness for defendant, testified: Is medical director of New York Life Insurance Company; is a licensed and practicing physician in New York; medical questions arising in connection with applications for life insurance are passed upon by the Medical Board; had the Suggs application been submitted to him as it came to the company, he would have approved it; if the application had disclosed, or the company had known through any other source, that during a period of five years Mr. Suggs had been in bad health and had been treated by doctors, action on the application would have been suspended and a full medical examination called for. If the company had known

when the application was received that for some time prior to applying for insurance Mr. Suggs had suffered from high blood pressure, goiter trouble, nervousness, and rapid pulse, the company would have declined to issue the insurance.

We think it is established that the insurance company relied on the statements made by Mr. Suggs in his application.

Were the statements made with intent to deceive and defraud the company?

In the able opinion of Mr. Justice Stabler in *Johnson v. New York Life Insurance Company, supra,* the writer said: "Finally, the intent with which representations or misstatements of facts are made is a thing that is locked up in the heart and consciousness of the applicant. It may be shown by his express words, *or it may be deduced from his acts and the facts and circumstances surrounding the making of the misrepresentations,* though on this question the mere signing of the application containing the answers alleged to be false is not conclusive." (Italics added.)

"Intent of Insured—According to some courts a concealment of a material fact avoids a policy though not made with fraudulent intent, but even under this view the insured is not required to go into details about which the insurer makes no inquiry. The better view, however, would seem to be that where no inquiries are made, a concealment must be made with fraudulent intent, but that intent is immaterial where the concealment relates to a matter with reference to which inquiry is made. Ordinarily the omission to communicate facts material to the risk will avoid the policy, although the assured did not suppose the facts to be material, but a provision avoiding a policy if the insured has failed to disclose any fact material to the risk imposes the duty of disclosure only where the insured knows that the facts are material. Concealment which is not fraudulent will avoid a fire policy if the conditions annexed to the policy and the form of application require the concealed fact to be stated,

and if one of. the conditions expressly provides that 'any misrepresentation or concealment' will vitiate the policy, or if the policy provides that no recovery shall be had under it if any circumstance material to the risk be suppressed. Again, matters material to the risk of a proposed insurance contract, and falling within the range of questions in the application, are 'withheld' within the meaning of a warranty therein that such facts have not been 'withheld,' where they are not disclosed." 14 R. C. L., § 204, p. 1025.

"Knowledge and Intent of Insured—An untrue statement concerning a matter of fact that is, or ought to be, within the personal knowledge of an applicant for life insurance constitutes a breach of warranty, and renders the policy void, where the policy makes the answers and statements contained in the application warranties, and constitutes them a part of the contract. *And in the case of a warranty as to a disease the policy may be avoided if the circumstances show that the insured could not have been ignorant of the presence of the disease."* (Italics added.) 14 R. C. L., p. 1069, § 250.

"But where insured undertakes to state fully all of the circumstances which affect the risk, he is bound to tell the truth, and a material concealment will avoid the policy." 32 C. J., § 488, p. 1272.

The case of *Atlantic Life Insurance Co. v. Hoefer,* decided by the United States Circuit Court of Appeals, June 15, 1933, and reported in 66 F. (2d), 464, 465, is in such exact analogy with our case, and so aptly discusses and decides the very questions we are interested in, that we quote from it copiously. It was tried first in the United States District Court for the Eastern District of South Carolina, upon a complaint brought to rescind a policy of insurance on the life of Frank C. Hoefer. From judgment for defendant, plaintiff appealed. Judge Soper delivered the opinion of the Court. From his opinion we take the various following extracts:

"It was charged in the bill that the insured in his application for the policy had made certain material misrepresentations which entitled the insurance company to cancellation. * * * The bill was dismissed by the District Judge on the ground that the staements made by the insured in the application were materially correct, and that he had acted in good faith toward the company, since he believed his statements to be true.

"The controlling facts are not in dispute. The application for the policy was made on March 7 and 8, 1930. The executed policy was delivered to the insured on or about March 27, 1930. It provided that the entire contract between the parties consisted of the policy and the application; that all statements of the insured should, in the absence of fraud, be deemed representations and not warranties; that no statement should avoid the contract unless it was false and contained in the application. * * * The insured died on October 23, 1930. The immediate cause of death was cerebral hemorrhage, and the second or contributing cause was hypertension or high blood pressure.

"The insured stated in his application that he was in good health so far as he knew and believed; that he had had his tonsils removed by a surgical operation in 1927; that he had not consulted or been treated by a physician during the preceding ten years; and that he had not had any other ailment, illness, or condition not stated above. The last-mentioned statements were not correct, for the insured suffered from daily headaches for a year prior to June, 1927, and on numerous occasions in 1927, and subsequent years, prior to the application, had caused his pressure to be taken by physicians, and it had been found at times to be abnormally high. In fact, he informed the soliciting agent of the company at the time of the delivery of the application that his systolic blood pressure had gotten up to about 160 several years before. But this information was withheld from the company. * * * He declared in his application that

his answers were complete and true, and that they were the only statements to be considered as the basis of the contract. * * * [Hoefer was 47 years old when he died. His blood pressure was taken several times and found to range from 140 to 160, and once went to 190. He knew that his blood pressure was too high and was worried about it. His tonsils and some infected teeth were removed.]

"If this medical history of the insured had a material bearing upon the risk involved, the failure to communicate it to the insurance company prevented recovery in this case; for it is not a sufficient excuse that the insured believed that he had been cured. * * * It was for the company and not for him to decide upon what terms, if at all, it was willing to insure his life. The medical testimony in the case shows quite conclusively that a blood pressure of 160 is abnormally high for a person of the age of the insured, and the maintenance of such a pressure for a substantial period of time is likely to be followed by a permanent hardening of the blood vessels, a condition of much significance in estimating the chances of longevity. * * *

"It follows that the facts omitted by the insured from his answers to questions propounded to him in the application had a material bearing upon his general health, and upon the risk which the company was requested to undertake; and the great importance of these inquiries is all the more clearly seen from the death of the insured from cerebral hemorrhage shortly after the policy was issued. [Citing cases in support of these conclusions.]

Furthermore, these cases show that the claim of good faith upon which the beneficiary chiefly relies * * * is not a valid defense, for they establish the rule that a material representation, known by the insured to be untrue, invalidates a life insurance policy without further proof of actual conscious design to defraud."

Let us recapitulate the facts of our present case, and note the striking parallel in which they stand with those just

narrated from the *Hoefer case,* which, if it be not control-
ling, is of great persuasive value.

In 1928, Mr. Suggs went to Dr. Neil for a physical ex-
amination. It was disclosed that he had an abnormal blood
pressure (180); that he had thyroidism, a disease of the
thyroid gland in the nature of goiter; had exophthalmia, a
protruding of the eyeballs, which is symptomatic of goiter;
he had rapid heart action. He was informed of the thyroid
condition and advised to have it attended to or it would in-
jure him. He had facial paralysis.

In June, 1931, he called in Dr. McGill, who found him
suffering from a burning sensation in the stomach, and with
a rapid heart, and nervousness. He was given a hypodermic
injection of morphine to ease his pain. At this time he in-
formed Dr. McGill that he knew he had a rapid heart. In
July, 1931, he made application to the defendant insurance
company for a policy of insurance on his life, in which ap-
plication he stated that he had had no illness within five
years preceding the date of the application, and that within
that time he had not consulted, nor been treated by, a physi-
cian or practitioner. In answer to specific questions he said
he had never had, and had never been told that he had, high
blood pressure, heart trouble, disease of brain or nervous
system, or paralysis. July 16, 1931, he applied for insurance;
there was no medical examination; the company relied on
his statements and answers. The policy was issued and de-
livered August 13, 1931. *April 3, 1932,* he went to the hos-
pital by the advice of Dr. Neil to be operated on for the
very things which Dr. Neil had advised him to have attended
to in 1928. At the hospital it was found that he had a "fast
and irregular heart, nervousness and weakness, pain and
burning in his abdomen—epigastric—, bulging of the eyes
—exophthalmia—, was tender in the upper belly and had
a tremor of his fingers." He was operated on a few days
thereafter, and died May 18, 1932, of angina pectoris, or

coronary thrombosis, which is a clot stopping the blood vessels of the heart.

As against the charge that the insured deceived the insurance company as to his real condition of health, nothing is opposed save the testimony of three witnesses that he was a man of good reputation.

We are not unmindful that when one who is insured has died it is dangerous to deny payment to the beneficiary because one arises, it may be a complaisant doctor, to dispute statements made by the insured in his application, which, if untrue, would render the contract of insurance invalid. It behooves the Court to scrutinize such cases with especial care.

In the present case we think such danger does not arise. There was no prior medical examination; the insurance was issued upon the strength of the statements made by the insured and which he guaranteed were complete and true, and upon which the company might rely as the basis of the contract of insurance. The testimony of three doctors discloses that the answers to the questions propounded by the application to the applicant were not true. All of these medical men were friendly to the insured. The declaration of the invalidity of the contract of insurance does not depend alone upon the fact that the applicant in his application stated that he had never been told that he had, or had had, certain named diseases within a named number of years preceding, and that the testimony of medical men discloses that he had been so told. But the declaration of invalidity of the contract is founded also upon the fact that the statements made by the insured in his application that he had not had the specified diseases, or other ailments, had not consulted any doctor nor been treated by one within the five years preceding the making of the application, that he was then and had been continuously in sound physical and mental health, was shown by the testimony of three medical men, all of friendly dis-

position toward the insured, and by the physical facts shown by the record, to be untrue.

In these circumstances the duty of the Court is plain to declare the contract of insurance void.

The judgment of the Circuit Court should be reversed, and the case remanded, with directions to enter judgment for defendant under Rule 27. Let the amount of the premium paid into Court by the defendant, together with interest thereon at the rate of 7 per cent. from the date of its repayment, be paid to the plaintiff.

This opinion was written as the main opinion, but as a majority of the Court do not agree, it becomes the minor opinion.

MR. ACTING ASSOCIATE JUSTICE W. C. COTHRAN concurs.