16604

REESE v. WOODMEN OF WORLD LIFE INS. SOC.

(69 S. E. (2d) 919)

194

*Messrs. Julien D. Wyatt and Felix L. Finley, Jr.,* of Pickens, *for Appellant,* cite:

Mr. W. G. Acker, of Pickens, *for Respondent,* cites: █

March 18, 1952.

STUKES, Justice.

This appeal is from a directed verdict for the defendant in an action upon a policy or certificate of life insurance. The deceased was formerly a member of the Woodmen of the World fraternal order and was solicited for reinstatement by a representative of the insurer in April 1949. This representative or agent was called as a witness by the defendant and testified that he had been a fellow employee in a cotton mill and worked part time for the defendant as a solicitor. He said that he did not know that the deceased had any physical infirmity but, quoting from his testimony, "asked him about the condition of his heart and he said there wasn't anything serious wrong that he knew of, and I (the witness) said I would have to take him to a medical doctor to examine him." The witness, who was paid a commission from the first premium, which he collected, had known the deceased well for fifteen or twenty years, had fished with him and had visited in his home but, as stated, knew of no physical disability.

The local lodge or camp of the defendant voted favorably on a prospect, which was done in this case, and the solicitor

then called upon him. At the time of the solicitation for the insurance the deceased had just come from his work in a store where he was a meatcutter, which was heavy work involving the lifting of quarters of beef, and he appeared to the witness to be the picture of good health. His reputation for industry, honesty and fair dealing was as good as that of any man in his town. Other witnesses also testified to the good reputation of the deceased.

The complaint was usual in form and the answer admitted the issuance of the policy on April 20, 1949, but alleged as a defense to liability the falsity of material representations in the application which was in two parts and was incorporated into and made a part of the policy. In part II of the application there appear the following questions and answers: "8. Have you within the past ten years suffered any mental or bodily disease or infirmity, or have you within that period of time consulted, been attended or examined by a physician? If so, state which, when, giving full particulars and name of physician. Answer, Yes—Appendix removed. * * * 10. When were you last attended by a physician? For what? Give name and address of physician. Answer—1942, Appendix removed. * * * 12. Have you ever suffered from high blood pressure, paralysis, tuberculosis (consumption), diabetes or any chronic disease? If so, which? Give date, duration and name of attending physician. Answer—No. 13. Have you ever had any disease or injury other than those above mentioned? If so, give date, disease or injury, duration, name and address of physician. Answer—No. * * * 15. Are you in good health to the best of your knowledge and belief? If not, give reason. Answer—Yes."

The insured in the policy, then applicant, further signed the following, which was a part of the application: "I have read each of the foregoing questions and answers thereto, and represent that each of said answers is full, complete and true, to the best of my knowledge and belief, whether written by my own hand or not; and I agree that any material untrue statements or answers or any concealment

of fact in this application shall make any benefit certificate which may be issued to me on this application null and void and forfeit all rights of any person or persons thereunder."

The medical evidence will be stated in some detail because it is of controlling importance. Dr. Cutchin, a general practitioner of Easley since 1929, said that he treated the deceased in 1948 for coronary thrombosis and also saw him once or twice in 1949. He stated from memory that he saw him professionally at least five or six times during the period of a year or so. He described the disease and said that it might be said to be temporary and permanent; that it is possible to get over it; further that unless the heart muscle was damaged, it is hard to tell from examination that there has been a previous attack. Describing the symptoms of the deceased the witness said, quoting, "He had pain in his chest, down in his arms, and up in his arm, severe pain." The patient was told by the doctor to regulate his life, stop hard work, take things easy and stop worrying; work was recommended that did not require hard labor or worry. The doctor did not recall whether he told his patient that his condition was permanent but he did tell him how to regulate his life. Asked on cross-examination whether the deceased knew that he had coronary thrombosis, the witness replied: "No. He thought he had acute indigestion, as I remember." This general practitioner testified that he referred the patient to Dr. Stanley of Greenville and when asked by respondent's counsel what was Dr. Stanley's diagnosis, appellant's counsel objected to answer as hearsay, and the court sustained objection. It is within common knowledge that when a general medical practitioner refers a patient to a specialist, the latter reports his findings to the referring physician.

The proof of death which was filed with respondent in support of claim upon the policy was signed by Dr. J. H. Jameson of Easley who therein certified that he was in professional attendance upon the deceased for about six months

prior to his death when he was confined to his home or prevented from attending to his business, and was treated during these six months, from December 1949, for coronary thrombosis, and this doctor last visited him on June 26, 1950. There was no other complication. The certificate contains the statement that the deceased had also been attended by Dr. Stanley.

The medical examiner for the respondent Society testified that he had been engaged in practice for thirty-six years and lives five and a half miles from Easley. He knew the deceased for twenty-five or thirty years and the latter played baseball on a team operated by this doctor, and was a good player and continued to play until he was about forty years old. When asked whether he made a careful physical examination of the deceased for the purpose of the insurance application, the doctor said that he followed the questions on the standard blank and recommended the appellant as a first-class risk. He had no information of any previous illness except the old appendectomy of which the deceased told him. He was asked whether it was his opinion that an examinee's heart might be found to be normal and at a prior or later date found to be affected by coronary disease, and he replied as follows: "A man's heart, with a disease or not diseased, comes and goes. There's times that a man with these conditions that are spoken of here can rest up and get by any doctor, I don't care who he is, unless he runs all the machinery tests. The average practitioner does not run all those machinery tests because he does not have the equipment; but, he can get by."

The deceased was born, according to his application for the insurance, on May 23, 1896, applied for the insurance on April 11, 1949, which was issued under date of April 20, and died on July 6, 1950, having meanwhile paid the monthly premiums which aggregated $64.12; which amount, by way of refund of the premiums, respondent tendered to appellant, the widow, by check before trial; and in currency during the trial. The latter cash tender was refused in open

court but the previously issued check was retained, unused, by appellant's attorneys.

The appellant, who is the widow of the deceased and designated beneficiary of the policy, testified that her husband gave up his former textile work after March 1949 and thereafter worked for merchants. She knew that he was under the care of Dr. Cutchin in 1948 but the deceased did not tell her anything about his condition except that he was leaving his textile employment because of his talks with the doctor. She could not remember whether he was under the care of other doctors except that he might have been twice to Dr. Stanley in Greenville. On cross-examination she further said that in 1950 he was attended by Dr. Couch of Easley who is now in the army. The deceased did tell her that he suffered from, quoting, "something like acute indigestion starting from here (demonstrating)." On the night of his death he had been to church about twenty-two miles from home and had returned about 10:30 that night. On redirect examination she qualified the foregoing by saying that he quit the textile work because he was changed from the first shift and could not sleep during the day. He made as much money on the new jobs as before.

Appellant and respondent moved for direction of the verdict which the court considered overnight and concluded that respondent was entitled to direction of the verdict in its favor upon the cited authority of *Johnson v. New York L. I. Co.,* 165 S. C. 494, 164 S. E. 175, and *Murray v. Metropolitan L. I. Co.,* 193 S. C. 368, 8 S. E. (2d) 314. The informal ruling in open court, which is a part of the appeal record, also contains references to numerous other of our earlier decisions which proves the painstaking research and consideration which the court devoted to the motions. After similar effort and with the same reluctance we are constrained to agree.

> The conclusion is unavoidable upon the record that the deceased wilfully withheld from respondent and its medical examiner the history of his recent medical

treatment for the purpose of misleading respondent and procuring the insurance by means of the misrepresentations, upon which respondent relied. That is the only reasonable inference from the evidence. The misstatements of the applicant have been considered as representations rather than warranties because the application contained the following fair condition: "Misrepresentations or false warranties shall not defeat or void the certificate unless they shall have been made with actual intent to deceive or materially affect either the acceptance of the risk or the hazard assumed by the Society." There was convincing "home office" evidence by deposition that the misrepresentations caused the acceptance of the risk and issuance of the certificate, without which the application would have been declined by the insurer.

The case is one of the rare ones of its class in which verdict ought to be directed for the insurer. This court is quite liberal in such cases in allowing juries to pass upon questions of alleged fraud in the application for insurance, which is exemplified by the recent decisions of *Metropolitan Life Ins. Co. v. Bates,* 213 S. C. 269, 49 S. E. (2d) 201, and *Mickle v. Dixie Security L. I. Co.,* 216 S. C. 168, 57 S. E. (2d) 73. However, the result which we reluctantly reach in this case is dictated by the decisions cited by the trial court, supra, and others in our reports, with the citation of which this opinion need not be prolonged. Waiver or estoppel based on the knowledge of the insurer's agent, absent here, was important in *Mickle v. Dixie Security L. I. Co.* and the vital difference in facts of *Metropolitan Life Ins. Co. v. Bates* is seen in the following quotation from the opinion in the latter, 213 S. C. at page 280, 49 S. E. (2d) at page 206: "The facts of the *Johnson case* and of the *Parker case* [*Parker v. Pacific Mut. Life Ins. Co.,* 179 S. C. 117, 183 S. E. 697], both *supra,* are in sharp contrast to the facts of the case in hand. The one consultation with a physician by appellant, of which there is uncontradicted evidence, was very minor in comparison, and the evidence indicates that applicant thought it so much so

that he did not call it to the attention of respondent's soliciting agent who filled the application for him, and appellant frankly said on cross-examination that he would have made the same omission had he personally filled the blank. Reasonable inference from this testimony is, as said, that he considered it of insufficient consequence to notify the company by answering affirmatively as to it. For the same reason it is questionable whether if the incident had been reported in the application and if respondent had made inquiry of the physician, it would have been deterred from issuance of the policy by information from the latter. There was no testimony as to that."

Appellant has earnestly argued the firmly established rule that examination by a physician of an insurer's choice, as here, is evidence that there was no important physical defect or that the insurer with knowledge thereby obtained or imputed, waived the condition. But here that evidence or presumption is irrelevant because of the proof which established beyond doubt the applicant's recent, contemporaneous and extended medical care for a serious heart disease which continued and caused his early and untimely death, and the failure of the examiner to detect it; and the latter's explanation of the inaccuracy of his report was uncontradicted. There was no other evidence of waiver. Indeed, that issue appears not to have been made in the trial court but we have nevertheless considered it in the light of the facts and find without difficulty that there is no merit in the contention.

The result of this case is not dependent upon the existence of the serious heart disease of the deceased, and his knowledge of it, but is governed by his failure to disclose the medical attention which he had received, and was receiving, for the physical condition which occasioned his repeated consultations with physicians. Common honesty required disclosure, aside from the express contractual terms of the application, which have been quoted. The following clear statement from the opinion in *Murray*

*v. Metropolitan L. I. Co., supra,* is applicable, 193 S. C. 376, 377, 8 S. E. (2d) at page 317:

"But there is no evidence in the record from which a reasonable inference may be drawn that the company waived the falsity of the representations made by the deceased in his reinstatement application to the effect that he had not since the date of the issuance of the policy in suit consulted any physician or physicians. These representations, as shown by the evidence, were false, were material to the risk, were acted upon by the insurer, and were known by the insured to be false.

"The representations related to facts within the knowledge of the applicant, and not within the knowledge of the company, and were material. In such case the applicant must answer truthfully. As was said in *Mutual Life Ins. Co. v. Leaksville Woolen Mills,* 172 N. C. 534, 90 S. E. 574, 577: '* * * The purpose of such questions is twofold: First, to elicit information, which the company regards important; second, to give the sources from which the company may obtain further information. The parties themselves have made these questions and answers material. Their materiality depends, not only upon their own purport, but upon the fact that the contracting parties have agreed that the written application containing these questions and answers is the basis upon which the contract of insurance shall be made or refused.' "

As was said in *Johnson v. New York L. I. Co., supra,* 165 S. C. at page 499, 164 S. E. at page 176: "It is inconceivable that, under the circumstances, the insured did not know that his answer to the question as to whether he had consulted a psysician, etc., was untrue. The case is different in this respect from *Rogers v. [Atlantic Life] Insurance Co.,* 135 S. C. 89, 133 S. E. 215, 45 A. L. R. 1172, in which the question was whether the insured knew that he had suffered from cancer."

The trial judge made it very clear that his direction of verdict for respondent was based upon the terms of the con-

tract and the misrepresentations by the applicant as to consultations with physicians, and was not based upon the diseased condition, in fact, of the applicant or his knowledge thereof. This we affirm, whereby the law and precedent of the case is so restricted. The distinction was clearly and forcefully stated in the opinion by the present Chief Justice in *Grant v. Metropolitan L. I. Co.*, 194 S. C. 25, 9 S. E. (2d) 41, 44: "Whether one applying for life insurance has within a two year period been treated for a serious ailment is material to the risk. A thorough physical examination by a physician would not disclose this fact. It is upon the theory that if one is not in 'sound health' * * * an examination by a physician will disclose such condition to exist; and therefore, either the alleged disease did not exist or that its existence was known to and waived by the insurer. While the record leads to the conclusion that only a superficial examination of the insured was made by Dr. Abel, the physician employed by appellant, yet as above stated, no amount of diligence on his part in making a physical examination of the insured would have disclosed that the insured had been treated at the Veteran's Hospital for a serious disease or ailment."

In the case at bar, whether the deceased knew he had a serious heart disease may have been an issuable fact; that he concealed medical attention therefor was not, under all of the evidence. The effect of the concealment under the quoted terms of the application cannot, in reason, be doubted or avoided.

Numerous questions were submitted in appellant's carefully prepared brief but adverse answer to all of them is required by what has been said and separate statement and discussion of them would serve no useful purpose. The several exceptions will have to be overruled.

Judgment affirmed.

BAKER, C. J., and FISHBURNE, J., concur.

OXNER and TAYLOR, JJ., dissent.

OXNER, Justice (dissenting).

I am unable to agree with the conclusion reached by a majority of the Court that the only reasonable inference warranted by the evidence is that the certificate or policy of insurance involved in this action was procured by fraudulent misrepresentations on the part of the assured. I am clearly of opinion that this question should have been submitted to the jury.

It is conceded in the majority opinion that the statements made by the insured constituted representations and not warranties. The legal effect of a representation is quite different from that of a warranty. *Nix v. Sovereign Camp W. O. W.*, 180 S. C. 153, 185 S. E. 175. It is held in some jurisdictions that a material misrepresentation made by an applicant for life insurance, in reliance on which a policy is issued to him, avoids the policy, even though made through mistake and in good faith. But under our decisions the good faith of the insured is a vital consideration. The rule applied in this State is succinctly stated in *Johnson v. New York Life Insurance Co.*, 165 S. C. 494, 164 S. E. 175, as follows:

"Where a statement of fact in an application is only a representation, its mere falsity is not sufficient to avoid the policy, its materiality and the good faith of the applicant in making it being important considerations. Under the issues made in the case at bar, it would be necessary for the defendant to show that the statements in the application relied on to defeat the policy were untrue, that their falsity was known to the applicant, that they were material to the risk and relied on by the insurer, and that they were made with intent to deceive and defraud the company.

\* \* \*

"Finally, the intent with which representations or misstatements of facts are made is a thing that is locked up in the heart and consciousness of the applicant. It may be shown by his express words, or it may be deduced from his

acts and the facts and circumstances surrounding the making of the misrepresentations, though on this question the mere signing of the application containing the answers alleged to be false is not conclusive."

Assuming, as the evidence rather conclusively shows, that at the time the insured made this application he had a heart condition rendering him uninsurable, I do not think it can be said as a matter of law that this condition was known to and concealed by him with the intent to defraud the company. It seems to me that there are strong circumstances negativing any such intent, which required the submission of this issue to the jury.

The insurance was written on the solicitation of respondent's agent. The application was made by assured when he appeared to be in good health and was regularly employed. There is no testimony to the effect that insured was ever told that there was anything wrong with his heart. Dr. Cutchin, the attending physician, unequivocally stated that insured "thought he had acute indigestion". His testimony certainly warrants the inference that insured was unaware of any defective heart condition. This being true, it is difficult to perceive how it can be said that he knowingly concealed this disease from respondent. The symptoms related by him to Dr. Cutchin might easily incite suspicion of heart disease in the mind of a physician, but would not necessarily alarm a layman of limited education with no knowledge of medicine. It is true that Dr. Cutchin testified that he told the insured to regulate his life, discontinue hard work and stop worrying, but evidently the insured did not think it was necessary to follow these suggestions because after the policy was issued, he continued to engage in heavy work as a butcher in a grocery store.

Assuming that the circumstances were such as would have led a person of ordinary prudence to believe that he had heart disease, fraud cannot be predicated upon imputed knowledge. Respondent's examining physician, who had known the insured for twenty-five years, found nothing

wrong with his heart and recommended him as a "first class" risk. Can it be said that insured should have known and disclosed to respondent what this physician failed to find?

It is contended and the lower court held, that assuming the insured did not know he had heart trouble, he did know and should have disclosed to respondent that during the previous year he had been attended by a physician. There is no showing that insured was ever confined to his home or visited there by Dr. Cutchin. The consultations with this physician were probably made at his office. If the insured thought his trouble was indigestion, he might easily have regarded this as an inconsequential, temporary ailment which need not be reported. In *Krauza v. Golden Seal Assurance Society,* 221 App. Div. 380, 223 N. Y. S. 143, 145, the Court said: "The applicant's consultation with a physician would be material as a matter of law only if the consultation were for a physical condition which left some permanent weakness or indicated a predisposition to serious malady. If the consultation were for a temporary functional disorder, without permanent effect, it might not be a material fact, and might not reasonably be thought, by an applicant to whom such a question is put as was answered by the applicant here, to have been within the intent of the question."

On direct examination, the soliciting agent of respondent testified: "I asked him (insured) about the condition of his heart and he said that there wasn't anything serious wrong that he knew of, and I said I would have to take him to a medical doctor to examine him." Such a statement, if made, was sufficient to have put this agent on inquiry as to possible heart disease, which if pursued with due diligence, might have led to the knowledge of insured's condition. *Abercrombie v. Pilot Life Insurance Co.,* 214 S. C. 350, 52 S. E. (2d) 400, 402. Moreover, this statement would certainly not be consistent with the contention of respondent that the insured sought to conceal his physical condition. As stated in the *Abercrombie case,* a statement of this nature "bespeaks honesty and negatives the charge of fraud." An-

other circumstance negativing fraud is that when insured was asked in the application to give the name and address of his family physician, he answered "Dr. J. H. Cutchin, Easley, S. C.", who could have given full information as to the applicant's physical condition.

It is stated in the majority opinion: "whether the deceased knew he had a serious heart disease may have been an issuable fact; that he concealed medical attention therefor was not, under all of the evidence." It is true that the application contains a misstatement with reference to the medical attention which insured received from Dr. Cutchin and apparently the Court infers a fraudulent intent *as a matter of law* from such misstatement. At least there is no other evidence of such intent. But I think under the circumstances of this case that was a question for the jury to determine. As pointed out in *Johnson v. New York Life Insurance Co., supra,* and as consistently held by this Court, *the mere fact that the insured signed an application containing misstatements of fact with reference to his medical history is not conclusive. It must further appear that such misstatement was made with intent to deceive and defraud the insurer.* In the majority opinion little, if any, consideration is given to this element of intent. If insured intended to defraud the Society by concealing the fact that he had consulted Dr. Cutchin, why did he give the name and address of Dr. Cutchin in his application? If he had such intent, why did he tell the soliciting agent, as respondent claims he did, that "there wasn't anything serious wrong (with his heart) that he knew of"? No explanation of these circumstances can be found in the majority opinion.

The views herein expressed are fully sustained by the following decisions: *Sligh v. Sovereign Camp W. O. W.,* 117 S. C. 437, 109 S. E. 279; *Rogers v. Atlantic Life Insurance Co.,* 135 S. C. 89, 133 S. E. 215, 45 A. L. R. 1172; *Sirgany v. Equitable Life Assurance Society,* 173 S. C. 120, 175 S. E. 209; *Suggs v. New York Life Insurance Co.,* 174 S.

C. 1, 176 S. E. 457; *Crumel v. Metropolitan Life Insurance Co.,* 179 S. C. 338, 184 S. E. 169.

I am unable to reconcile the foregoing cases with the conclusion reached in the majority opinion. Illustrative of what they hold is the case of *Sirgany v. Equitable Life Assurance Society, supra.* [173 S. C. 120, 175 S. E. 211.] In that case the application for insurance was made in June, 1929, and the insured died on May 4, 1930, of chronic lymphatic leukemia, from which she had probably suffered for several years. In the application this disease was not disclosed and the insured stated that within the preceding five years she had only suffered from *minor ailments* with good recovery| In holding that the issue of fraud was properly submitted to the jury, the Court said:

"We have read with painstaking care the entire record and are constrained to hold that the trial judge properly submitted the case to the jury. While, as already indicated, Drs. Buist and Wilson expressed the opinion that Mrs. Sarkis must have known that she was not a well woman, they both stated positively that they had not disclosed to her the nature of her disease or that it would prove fatal. In addition, Dr. Buist testified that he had known her for about twenty years, that he had always found her perfectly honest, and that her general reputation was good. Dr. Frampton, who it must be assumed made a proper examination of the applicant in order to determine whether she was a good risk for insurance, was unable to find anything wrong with her. As more than one inference could be drawn from the testimony, the court could not say, as a matter of law, that Mrs. Sarkis intended to deceive the company and to perpetrate a fraud upon it by her answers, which were representations and not warranties, to the questions propounded by the medical examiner.

"The appellant argues that this case is controlled by the principles announced in *Johnson v. New York Life Insurance Company,* 165 S. C. 494, 164 S. E. 175. We think, however, that the cases are easily distinguishable. In the

*Johnson Case* the insured stated in his application that he did not drink spirits or other intoxicants in any quantity at all; that he had only taken an occasional drink in the past, and had not taken any of them to excess in the last five years. The undisputed testimony, as stated in the opinion, showed that, during the five years immediately preceding the signing of the application, Johnson had been treated by his physician for alcoholism on ten different occasions, on one of which he was confined to the hospital, that some of such periods of illness would last from one to four weeks, and that he was advised by one of the attending physicians to discontinue the use of alcohol as the physician thought it would ruin his health. This court held that the facts were clearly of such nature that Johnson could not fail to know them when answering the question in the application as to his consultation of a physician; certainly they were of such nature that he would be conclusively presumed to know them.

"In the case at bar the facts testified to by the several witnesses present, as disclosed by the evidence recited, a different situation. The case is more nearly like *Rogers v. [Atlantic Life] Insurance Company,* 135 S. C. 89, 133 S. E. 215, 45 A. L. R. 1172, where the defendant complained that the applicant answered falsely the questions relating to previous ailments and surgical operations, with the intent to deceive and defraud the company into the issuance of the policy applied for by him. While there was testimony to the effect that the insured had been operated on for cancer, it was undisputed that he had not been told by the surgeon who performed the operation, or by any one else, that he had cancer; and the physician who examined him for the company testified that he found no evidence of cancer or, as happened in the present case, anything that indicated that Rogers at the time was not in good physical condition or was not a good risk for life insurance. In that case, as in the present case, testimony was offered as to the good character and honesty of the insured. The court held that it was for the jury to say, under all the testimony, whether

the insured, at or before the time he answered the question, had cancer, and whether, when answering the questions, held to be representations and not warranties, he knew that he had or had had cancer, if this were the case, and whether he answered as he did for the purpose of defrauding and deceiving the insurance company."

I would reverse the judgment appealed from and remand the case for trial by jury on the issue of fraud and deceit

TAYLOR, J., concurs.