### SOUTHEASTERN LIFE INS. CO. v. PALMER

#### (124 S. E., 577)

1. INSURANCE—WHETHER INSURED MADE FRAUDULENT REPRESENTATIONS IN APPLICATION HELD FOR JURY.—In action on life policies, whether insured made fraudulent representations in application as to his health *held* question for jury.

2. INSURANCE—CONSCIOUS FRAUD ON PART OF APPLICANT NOT INFERRED FROM MERE INACCURATE ANSWERS.—Conscious fraud, on the part of insured, could not be inferred from mere inaccurate answers in ap-

Note: For authorities discussing the question of forfeiture of life insurance by false representations with respect to previous applications for insurance, see note in 55 L. R. A., 122.

On the general rule as to whether medical examiner is agent of insurer or of insured, see note in 41 L. R. A. (N. S.), 505.

plication, especially where answers were written by insurer's agents and testimony shows that insurer made subsequent thorough investigation of applicant's physical condition, independent of anwers.

3. INSURANCE—KNOWLEDGE OF INSURER'S PHYSICIAN OF FACTS PUTTING HIM ON INQUIRY IMPUTABLE TO INSURER.—Knowledge of insurer's physician of such facts as would have put reasonably prudent man on inquiry, and which if pursued with due diligence would have led to the knowledge of the fact that applicant had Bright's disease, would have been equivalent to actual notice on the part of insurer.

4. INSURANCE—WHETHER INSURERS RELIED ON REPRESENTATIONS IN APPLICATION OR ON INDEPENDENT INVESTIGATION AS TO APPLICANT'S CONDITION HELD FOR JURY.—In action on life policies in which there was evidence that the insurance companies did not rely on insurer's answers in applications but made independent investigations, question of whether they relied and acted on the insured's representations, or acted on their independent investigations without reference to representations, *held* for jury.

Before WILLIAM P. GREEN, SPECIAL JUDGE, Florence, Fall Term, 1922.    Affirmed.

Action by Southeasten Life Insurance Co. and Philadelphia Life Insurance Co. against Mary Keith Palmer individually and as administratrix of George P. Palmer, deceased.    From judgment for defendant against both plaintiffs on her counterclaim plaintiffs appeal.

*Mr. Philip H. Arrowsmith,* for appellant, cites: *Verdict should have been directed:*   68 S. C., 184; 42 S. C., 28; 52 S. C., 516; 122 S. C., 153; 109 S. C., 358; 108 S. C., 92; 25 Cyc., 949-951.    *Answer in application was material to the risk:*  115 S. C., 129.

*Messrs. Haynsworth & Haynsworth,* for appellant, cite: *Insurance company will not be estopped by knowledge of agent who negotiated the policy if the insured was a party to the deception:*   14 L. R. A. (N. S.), 280; 241 U. S., 613.

*Messrs. Parker & Gregg,* for appellant, cite: *False statement as to prior rejection:*   1 Bacon Insurance 4th Ed., 567; 3 Cooley's Briefs 2071; 14 R. C. L., 1080; 241 U. S.,

613; 22 Wall., 47; 126 Fed., 635; 112 Fed., 846; 41 L. R.
A. (N. S.), 505; 186 Pa. St., 269; 113 Ala., 453; 76 N.
W., 1041; 113 Mich., 526; 57 Atl., 438; 191 Pa. St., 484;
33 S. E., 539; 83 S. E., 5; 231 U. S., 543; 231 U. S., 560.
*False statement as to disease:* 14 R. C. L., 1073; 102 N.
W., 1020; 3 Cooley's Briefs 2096; 1 Bacon Ins., 532; 64
S. E., 432; 93 S. W., 1055; 91 U. S., 510; 55 Atl., 19; 69
S. E., 936; 60 So., 218; 131 N. Y. Supp., 588; 115 S. W.,
785. *False statement as to medical attendance:* 14 R. C.
L., 1074; 3 Cooley's Briefs 2156; 40 Atl., 1114; 86 A. S.
R., 813; 241 U. S., 613; 137 Pac. 73; 36 D. C. App., 8; 16
Ann. Cas., 267; 69 Atl., 385; 87 Atl., 428; 60 S. E., 983;
81 S. E., 1014; 90 S. E., 574; 88 Atl., 553; 104 S. E., 121.
*Materiality of statements:* 3 Cooley's Briefs 1933; 14
R. C. L., 1027; 66 L. R. A., 322; 48 L. R. A. (N. S.), 74;
18 L. R. A. (N. S.), 1190; 98 S. E., 424; 172 N. C., 534;
91 Wash., 543; 258 Fed., 425; 184 Ind., 722; 125 Colo.
App., 326; 149 N. Y. Supp., 345; 96 Va., 543; 231 U. S.,
543; 241 U. S., 643. *Test of materiality:* 3 Cooley's
Briefs 1953; Vance Insurance 267, 269, 284; 25 Cyc., 806;
48 L. R. A. (N. S.), 714; 53 S. E., 354; 75 S. E., 915; 69
S. E., 1036; 22 Wall., 47. *No fraudulent intent necessary:*
16 A. & E. Enc. L. 2nd Ed., 933; 25 Cyc., 801; 90 S. E.,
574; 241 U. S., 643; 231 U. S., 543; 231 U. S., 560; 146
Pac., 184; 137 Pac., 73; 113 S. W., 56; 140 S. W., 560;
69 Atl., 585; 140 N. Y. Supp., 211; 115 Fed., 77; 43 S. E.,
79; 94 N. W., 568.

*Messrs. Willcox & Willcox* and *D. Gordon Baker,* for
respondent, cite: *Additional instruction should have been
requested:* 115 S. E., 200; 115 S. E., 302. *Rights of
beneficiary under policy claimed to have been procured by
fraud:* 88 S. C., 31; 97 S. E., 164; 100 S. C., 121; 101
S. C., 325; 106 S. C., 419; 95 S. C., 196; 107 S. C., 21;
112 S. C., 139; 115 S. C., 59; 117 S. C., 437; 115 S. C.,
128; 112 S. E., 547.

October 4, 1924.

The opinion of the Court was delivered by MR. JUSTICE WATTS.

I do not concur in the opinion of Mr. Justice Cothran. I think all of the exceptions should be overruled and judgment affirmed.

The company did not act upon the application and the report of the local medical examiner, but made subsequent investigations. Three specimens of applicant's urine were sent to the home office.

Palmer applied for policies on April 2d. The policies were not issued until June 10th and not delivered until June 20, 1920.

The evidence conclusively shows that the company not only made a further examination as to Palmer's physical condition, but an investigation of his financial standing. It did not rely, in issuing the policy, upon the statements made by the applicant or upon the report of its local medical examiner and the statements made by the applicant to him; in addition, it required three different specimens of the applicant's urine to be forwarded to Philadelphia. It had these specimens analyzed. It consumed the months of April and May in additional investigations. After a thorough investigation, it issued the policies almost 10 weeks after they had been applied for.

As to whether there was fraud on the part of the applicant was a question for the jury. Conscious fraud could not be inferred from mere inaccurate answers, especially when the answers were written by the agents of the company, and the testimony shows a subsequent thought investigation by the company of the applicant's physical condition, independent of the answers of the applicant.

His Honor committed no error in submitting the case to the jury for their determination. Under the case of *Huestess v. South Atlantic Life Insurance Co.,* 88 S. C.,

31; 70 S. E., 403, a case very similar to this, this Court says in the opinion:

"There is no direct or positive testimony tending to show that the insured intended to practice a fraud upon the defendant other than the mere inference, arising from the signing of the application for insurance, containing the answers alleged to be false."

In that case this Court held that under the circumstances the question whether the insured was guilty of conscious fraud should have been submitted to the jury.

In this case the evidence is stronger, for we have an independent investigation by the company, running over a period of two months, before they issued and delivered the policies. The physician selected by the insurance company for the examination of Palmer was also Palmer's family physician and had treated him. If Palmer had Bright's disease, no one could have been in a better position to know it than Dr. Boykin.

If Dr. Boykin knew these facts, or if he were in possession of such facts as to have put a reasonably prudent man on inquiry, and if pursued with due diligence would have led to the knowledge of the fact that the applicant had Bright's disease, if he had it this would have been to the company the equivalent of actual notice.

We find in Black on Rescission and Cancellation, § 110, the following:

"A contract or obligation cannot be rescinded on the ground of false or fraudulent representations unless it is shown that the party to whom they were made placed his reliance upon them, that is, believed in their accuracy and depended on their correctness, and on the strength of his dependence upon them entered into an engagement or assumed an obligation which otherwise he would have avoided. In an English case it was said: 'Cases have frequently occurred in which, upon entering into contracts, misrepresentations made by one party have not been in any degree relied

upon by the other party.  If the party to whom the representations were made himself resorted to the proper means of verification, before he entered into the contract, it may appear that he relied upon the result of his own investigation and inquiry and not upon the representations made to him by the other party; or if the means of investigation and verification be at hand, and the attention of the party receiving the representations be drawn to them, the circumstances of the case may be such as to make it incumbent on a Court of Justice to impute to him a knowledge of the result, which, upon due inquiry, he ought to have obtained, and thus the notion of reliance on the representations made to him may be excluded.' "

Also in same Section 121:

"Where false and fraudulent representations are made concerning the subject-matter of a contract, but the person to whom they are made, before closing the contract (or before the time for payment arrives), inspects and examines the subject of the contract or conducts an independent investigation into the matters covered by the representations, which is sufficient to inform him of the truth, and which is not interfered with or rendered nugatory by any act of the other party, it is presumed that he places his reliance on the information acquired by such investigation and on his own judgment based on such facts, and not on the representations made to him, and therefore he cannot have relief because his bargain proves unsatisfactory to him."

Under these authorities, it clearly appears that neither of the insurance companies relied or acted on the representations as to the past history and the present condition made by the applicant Palmer, but, on the contrary, they took more time than usual for making independent investigations on their own account, and his Honor was right in submitting the question to the jury, the question whether they relied on and acted on the representations of the applicant Palmer, or whether they acted on

their independent investigations without reference to the representations made by the applicant.

We cannot see how the Court could have directed a verdict as asked by the defendants without overruling the *Huestess Case, supra. Ledford v. Metropolitan Life Insurance Co.,* 97 S. C., 164; 81 S. E., 497. *Turner v. Columbia National Life Insurance Co.,* 100 S. C., 121; 84 S. E., 413. *Baker v. Meropolitan Life Insurance Co.,* 106 S. C., 419; 91 S. E., 324. *Fowler v. New York Life Ins. Co.,* 107 S. C., 21; 91 S. E., 1043. *Wingo v. New York Life Ins. Co.,* 112 S. C., 139; 99 S. E., 436. *McLaurin v. Mutual Life Ins Co.,* 115 S. C., 59; 104 S. E., 327. *Sligh v. Sovereign Camp W. O. W.,* 117 S. C., 437; 109 S. E., 279. *Livingston v. Union Central,* 115 S. C., 128; 104 S. E., 538; Id., 120 S. C., 93; 112 S. E., 547.

I think judgment should be affirmed.

A majority of the Court having concurred in this opinion, it is the judgment of this Court that the judgment of the Circuit Court be affirmed.

MR. CHIEF JUSTICE GARY and MR. JUSTICE FRASER concur.

MR. JUSTICE MARION concurs in result.

MR. JUSTICE COTHRAN (dissenting): The Southeastern Company case: On May 1, 1919, George G. Palmer made a written application for insurance upon his life in the sum of $24,000, consisting of two policies of $12,000 each, payable at the rate of $50 per month for 20 years; one of the policies applied for being a 20-payment policy, and the other an ordinary life; the beneficiary in each being his wife, the defendant, Mary K. Palmer. The policies were issued and delivered to him on June 10, 1919.

The Philadelphia Company case: On April 2, 1919, Palmer made a written application for insurance upon his life in the sum of $10,000, consisting of two policies of $5,000 each, the beneficiary in each being his wife, the de-

fendant, Mary K. Palmer. The policies were issued and delivered to him on June 20, 1919.

The insured died on February 29, 1920.

These separate actions were instituted on the same day, June 9, 1920, for the purpose of having said policies declared void and canceled, upon the ground of misrepresentations and fraud by the insured.

The defendant answered in each case denying the allegations of misrepresentations and fraud, and demanding judgment for the amounts of the several policies, set up as counterclaims.

In the case of the Southeastern Life Insurance Company, the company made a motion before his Honor, Judge Shipp, for an order striking out the counterclaims of the beneficiary, and a motion for an order referring the case to the Master of Florence County, as a case in equity. Judge Shipp held that the counterclaims were properly pleaded, that the beneficiary was entitled to a jury trial upon them, and refused both of the motions. From his orders the company appealed, and on July 5, 1922, this Court affirmed them, 120 S. C., 490; 113 S. E., 310.

Thereafter the plaintiffs made reply in each case to the counterclaims, and by agreement the two cases were tried together before Hon. W. P. Greene, special Judge, and a jury at the fall term of the Court, 1922, the trial resulting in a verdict for the defendant, Mrs. Palmer, in each case. The two policies in the Southeastern Company called, in each, for the payment of 240 monthly installments of $50, two of which were unpaid and due at the time the answer was served; the verdict in that case was for $116.68. There were two policies of $5,000 each in the Philadelphia Company; the verdict in that case was for $11,823.85. From the judgments entered upon these verdicts the insurance companies have appealed.

At the conclusion of all of the evidence, each company made a motion for a directed verdict in its favor, upon the

29—S. C. R., 129.

counterclaims set up by the defendant, which motions were refused. The principal question involved in this appeal is the correctness of the ruling of the presiding Judge upon these motions. The grounds urged by the companies will sufficiently appear from the consideration which follows: Broadly stated, they rely upon certain representations alleged to have been made by the insured, for the purpose of obtaining insurance, which were material to the risk, acted upon by them, and which were false, known by the insured to have been so, and a fraud upon them.

The misrepresentations relied upon by the companies, to defeat liability, were as follows: That the insured had never before applied for a policy without obtaining it; that no application for insurance by him had theretofore been withdrawn, postponed, or declined; that upon no application theretofore made had the insured been offered a policy at a higher rate or upon a different plan from that for which he applied; that at the time of his application he was in good health, had had no other illness than malarial fever, had no disease of the kidneys; and that the last consultation with a physician was for malarial fever.

It would be tedious and unnecessary to detail the questions and answers contained in the applications for insurance and in the medical examinations, both of which were signed by the insured. Suffice it to say that this documentary evidence shows beyond a shadow of doubt that representations of the foregoing purport were made by the insured and as the basis of his application for insurance.

In the case of the Southeastern Company the application consisted of two parts: Part I, the formal application for insurance; and, part II, the medical examiner's report, the applicant's answers to the medical examiner, the family record, and the insurance record.

At the foot of part II, just before the signature of the applicant, was this stipulation:

"I hereby warrant and agree that all the aforesaid statements and answers, and all those contained in part I of this application, are true and are offered to the company as a consideration for policy."

In part I, there are these statements:

"I agree that this application and the answers to the medical examiner in part II of said application, shall be the basis of the contract between the parties hereto, and shall be conclusive upon any person having or claiming any interest in any insurance to be issued. That the truthfulness of each statement is material to the risk and is the sole basis of the proposed contract."

In the case of the Philadelphia Company the formal application (part I) contains this stipulation:

"I hereby agree that all representations and agreements made by or with the company * * * are * * * made a part of this application and the policy issued hereunder."

The application consisted of two parts: Part I, the formal application for insurance; and part II, the medical examination, family record, and insurance record.

. At the foot of part II, just before the signature of the applicant, was this stipulation:

"I hereby agree for myself * * * that all the foregoing statements and answers, and those made to the medical examiner, are true and complete and are offered to the company as a consideration for the contract which I hereby agree to accept."

It appearing as stated, beyond doubt that these representations were made, the initial inquiry is as to their character; that is, whether they must be construed as warranties or as simply representations, the distinction between the two being important, and sometimes vital as regards the applicable principles of law.

The law as to warranties is thus expressed in 3 Joyce, Ins. § 1962:

"Where it clearly appears by the express terms of the policy or from the entire contract, that a warranty was intended, the materiality of the fact, matter of circumstance warranted, is not a subject of inquiry in aid of the assured; for the latter, in such case, will be held strictly to his contract, however immaterial the matter may be; so that a breach of the warranty may be availed of, the policy be avoided, and assurer be thereby discharged from liability, whether the warranty be material to the risk or not, for the warranty being so made a part of the contract makes the matter material, and its falsity precludes recovery."

See, also, the authorities collected in the case of *Sligh v. Woodmen,* 117 S. C., 437; 109 S. E., 279, in the dissenting opinion of the writer.

On the other hand, a statement which is not construed as a warranty, but as a simple representation, will not avoid the policy unless four elements unite: It must have been false; it must have been material to the risk; it must have been acted upon by the insurer; it must have been known to be false by the insured.

In each one of the four policies this identical phrase is incorporated:

"All statements made by the insured shall, in the absence of fraud, be deemed representations and not warranties."

If therefore the companies rely upon them as warranties, the burden is upon them to show that they were fraudulently made; otherwise they must, under the express terms of the contracts, be construed as simply representations, subject to the particular rules applicable to representations.

The provision in the policies, above quoted (manifestly in the interest of the insured), means that all statements, whether under ordinary circumstances susceptible to the construction of warranties or not, shall in the absence of fraud be construed as representations; but that statements, ordinarily construed as warranties, accompanied by a fraudulent purpose, shall retain their character as warranties,

unaffected by the said provision and subject to the law applicable to warranties. So that the insurer has the alternative choice of showing that certain statements, ordinarily construed as warranties, were made with intent to defraud and therefore retain their character as warranties, unaffected by the policy provision, or that they were representations accompanied by the elements detailed, and destructive of the policy.

The investigation must therefore be directed to those inquiries:

1. Were the representations false?

2. Were they fraudulently made?

3. If not fraudulently made and therefore simply representations:

(a) Were they false?

(b) Were they material to the risk?

(c) Were they acted upon by the insurer?

(d) Were they known by the insured to be false?

The alleged misrepresentations, generally stated, refer to the previous "insurance record," as it is termed, of the insured, and to his physical condition. This insurance record is presented in written documents signed by the insured. As counsel for the respondent say in their argument:

"In support of its allegations the insurance companies placed in evidence the policies in question, the applications therefor, the reports of the medical examiners and certificates of good health dated June 20, 1919, as to all of which there was no controversy."

This is the record: On November 22, 1906, Palmer made application to the New York Life Insurance Company for insurance, $1,000. On account of the presence of albumen in his urine, as disclosed by two separate examinations, the policy was not issued to him. Later a policy was issued and offered to him based upon a different plan from that for which he applied. It provided that if he died within the first year, the amount payable should be $619.62; that

if he did not, the value would increase $19.62 per annum until 1926, when upon his death the amount would be $992. This policy was refused by him and returned to the company in June, 1908. That he was informed of this postponement and of its cause is conclusively shown by his own written statement in his application for insurance to the Life Insurance Company of Virginia, in January, 1919, where he says in answer to the question relating declinatoin: "N. Y. Life. Postponed in 1905 or 1906, on account of gonorrhea." Further, on his application to the New England Company in March, 1919, he stated: "Was postponed about 13 years ago by N. Y. Life."

On August 7, 1908, Palmer made application to the Penn Mutual Life Insurance Company for insurance. It was postponed, as he declares in a subsequent application to the same company in 1910: "Postponed by Penn Mutual 3 months, July 1907." Later it was declined.

On September 23, 1909, Palmer made application to the Ætna Life Insurance Company for insurance, at which time he had had the experiences stated above with the New York Life and the Penn Mutual. Notwithstanding, in his application he denied that he had been offered insurance at a higher rate or upon a different plan from that for which he applied. The application was declined on account of the presence of albumen in his urine.

On April 30, 1910, Palmer made a second application to the Penn Mutual for insurance, at which time he had had the experiences stated above with the New York Life and the Ætna. Notwithstanding, in his application he denied that he had ever applied for insurance without receiving a policy of the exact kind and amount applied for. This application was declined on account of the presence of albumen in his urine.

On January 13, 1919, Palmer made application to the Life Insurance Company of Virginia for insurance, at which time he had had the experiences stated above with the

New York Life, the Penn Mutual, and the Ætna. Notwithstanding, in his application he denied that he had ever been declined insurance, or that any company had issued to him a policy of a different kind or for a less sum than he had applied for. This application was declined on account of the presence of albumen in his urine.

On March 8, 1919, Palmer made application to the New England Life Insurance Company for insurance, at which time he had had the experiences stated above, with the New York Life, the Penn Mutual, the Ætna, and the Virgina Life. Notwithstanding, in his application he denied that he had ever had an application declined, postponed, or modified, except a postponement by the New York Life on account of gonorrhea. (It appears by the record evidence that his policy in the New York Life was postponed on account of albumen and was issued upon a different plan.) The application to the New England Company was declined on account of the presence of albumen and hyaline casts in his urine, indicating Bright's disease.

On April 2, 1919, about a month before the application to the Southeastern, and upon the very day of his application to the Philadelphia Company, Palmer made application to the Missouri State Life Insurance Company for insurance, at which time he had had the experiences stated above with the New York Life, the Penn Mutual, the Ætna, the Virginia Life, and the New England. Notwithstanding, in his application he affirmed that he had no other application pending, that no company had ever declined to issue a policy to him or offered one different from that applied for, that he had had no other illness than stricture and malarial fever, that his health was good, and that no physician had ever expressed an opinion that his urine contained sugar, albumen, or casts. This application was declined.

It thus appears that every single representation relating to his previous insurance record was untrue. In 1906, he made application to the New York Life and did not receive

and accept a policy; in 1908, he made application to the
Penn Mutual and did not receive a policy, the application
being postponed and afterwards declined; not one of his
subsequent applications to the Penn Mutual, the Ætna, the
Virginia Life, the New England, or to the Missouri State
was accepted and policy issued.    His application in 1906
to the New York Company was postponed on account of
albumen in his urine.    The postponement is admitted in his
application to the Virginia Company in 1919, and to the
New England Company in 1919, as above shown.    In 1908
he was postponed by the Penn Mutual, and so admitted by
him in a subsequent application to that company in 1910.
His application to the Penn Mutual was at first postponed
and then declined.    In 1909, his application to the Ætna was
declined; in 1910, his second application to the Penn Mutual
was declined; in 1919, his application to the Virginia Life
was declined; in 1919, his application to the New England
was declined; in 1919, his application to the Missouri State
was declined.    In 1906 he made application to the New
York Life and was offered a policy upon an entirely differ-
ent plan from that for which he applied.

‾ His health record, from uncontradicted evidence, shows
that his representations relating thereto were equally untrue.
In 1906 the New York Company, acting upon his applica-
tion, made two examinations of his urine and found albu-
men present, an indication of Bright's disease.    In 1908,
his application was postponed by the Penn Mutual on ac-
count of albumen in his urine.    In 1909, his application was
declined by the Ætna for the same reason.    In 1910, his
second application to the Penn Mutual was declined for the
same reason.    In 1910, he was examined by Dr. Foster for
an application which was not sent in, and albumen discov-
ered.    In 1910, he was examined by Dr. McIntosh twice,
in January and February, and albumen discovered both
times.    Palmer at these times went to Dr. McIntosh with
the statement that albumen had been discovered and that he

had been advised by Dr. Knowlton to see Dr. McIntosh. Albumen was discovered in "considerable quantities." In 1912, he was examined by Dr. McIntosh in April, May, June, July, and September, and upon each occasion albumen was discovered. In 1913, he was again examined by Dr. McIntosh with the same result, and again in 1914. Dr. McIntosh testified that on all of these visits, from 1910 to 1914, he examined Palmer's urine; that that was what he came for; that albumen was always present, which indicated inflammation of the kidneys, Bright's disease; that Palmer was aware of his condition and seeking relief from him. In 1914 or 1915, he was examined by Dr. Houck for insurance. He was craried to Dr. McLeod, who found albumen and casts. The latter testified:

"If they are found in several examinations, they may mean something—Bright's disease. Mr. Palmer knew that."

In 1919, upon his application to the Virginia Company, his urine was examined chemically and microscopically. Albumen and casts were discovered, and the application was postponed for six months. In all, 14 analyses were made of his urine by as many expert analysts, whose testimony there is no reason to question; and in every instance the telltale albumen and casts were discovered. It is past all conjecture or doubt that he knew of his condition (which could have but one termination), as he had been explicitly informed of it by at least four physicians, some of whom he had consulted for the very ailment that gripped him. Notwithstanding his condition and knowledge, he represented that he was a sound man, that his last consultation with a physician was for malarial fever, that he had no disease of the kidneys, that he had had no other illness than malarial fever, and that he had never been told that he had albumen or casts in his urine.

The result is "confirmation strong" of the analyses and diagnoses that had been made, to his knowledge. The

policies were delivered in June or July. In January, 1920, he was operated on for infected tonsils. He succumbed on February 29th, as a result of Bright's disease, which rendered the comparatively simple operation fatal. With this persistent concatenation of untrue representations, in every instance of which he is obliged to have known, and in many instances he is positively shown by his own statements to have known, of their falsity, the conclusion is irresistible that they were fraudulently made for the purpose of obtaining insurance which he knew he could not obtain if the truth had been told. If this conclusion be correct, and as to it I entertain no doubt, the representations or statements must be construed to be warranties, and no further inquiry than as to their falsity is required. As to that, there can be but one answer. So that it becomes unnecessary to inquire whether or not, considered simply as representations, the elements of an avoiding misrepresentation exist.

But if that inquiry should be considered necessary, the conclusion is inevitable that they do. That they were untrue has abundantly been shown; that the insured knew that they were untrue is equally demonstrated; that they were material to the risk and acted upon by the insurers cannot be denied. The authorities are overwhelming upon the legal aspects of the matter:

In 3 Cooley, Briefs Ins., 2071, it is said:

"Among the questions invariably asked of the applicant for life insurance, is whether he had ever applied to any other company for insurance and been rejected. The purpose of the question is perhaps twofold—to discover whether the risk has ever been regarded as unsafe by other insurers, and to show the applicant's anxiety for the insurance. Whether the applicant has ever applied to other companies for insurance and been rejected is therefore regarded as material to the risk, and a false statement in this regard will avoid the policy."

In a note to 7 Ann. Cas., 676, it is said:

"If an insurer requires a statement, as part of the basis of the contract, as to whether other life insurance has been applied for and refused, the matter is hereby made a material fact within the rule htat misrepresentation or concealment of a material fact entitles the insurer to avoid the policy."

In 14 R. C. L., 1080, it is said:

"A statement as to previous rejectoins is material as a matter of law, and, if false, avoids the policy, regardless of the good faith of the applicant; and *a fortiori* where the truthfulness of all statements in the application is made a condition to the validity of the policy, a false statement that the insured has not applied for other insurance avoids the policy."

In *Jeffries v. Insurance Co.,* 22 Wall., 47; 22 L. Ed., 833, in reply to the question, "Has any application been made to any other company?" the applicant answered in the negative. As a matter of fact, he had prior thereto applied for insurance in another company and had been insured therein. The plaintiff demurred to the defendant's plea setting up the misrepresentation as a defense. The demurrer was overruled; judgment for defendant, and the plaintiff appealed. Quoting from the record:

"The demurrer admitting that the statements made in the application were false, the question in the case, of course, was this: 'Was the plea bad because it did not aver also that the false statements were material to the risk'?"

The Court affirmed the judgment for the defendant company, holding (quoting syllabus):

"Any answer untrue in fact, and known by the applicant for insurance to be so, avoids the policy, irrespective of the question of the materiality of the answer given, to the risk."

The opinion declares:

"Many cases may be found which hold, that where false answers are made to inquiries which do not relate to the

risk, the policy is not necessarily avoided unless they influenced the mind of the company, and that whether they are material is for the determination of the jury.   But we know of no respectable authority which so holds, where it is expressly covenanted as a condition of liability that the statements and declarations made in the application are true, and when the truth of such statements forms the basis of the contract."

In *Anderson v. Fitzgerald,* 4 H. L. Cas., 483, cited in the Jeffries Case, in reply to the question, 'Has the party's life been accepted or refused at any office?" the applicant answered in the negative. The answer was false. The applicant had signed the application in which he had agreed "the particulars above mentioned should form the basis of the contract."   There was no express stipulation that the representations should constitute warranties.   Counsel for the company asked for a ruling that if the statement was untrue, it was entitled to a verdict, whether it was material or not; this was refused by the trial Court.   Upon appeal the House of Lords, in opinions by Baron Parke, Chancellor Lord Brougham, and Lord St. Leonards, reversed judgment for plaintiff, upon the ground that the materiality of the statement should not have been submitted to the jury.

In *Mutual Life Co. v. Hilton-Green,* 241 U. S., 613; 36 Sup. Ct., 676; 60 L. Ed., 1202, the applicant made the following statement, which was warranted to be true and offered as the consideration of the proposed contract:

"I have never made an application for life insurance to any company or association upon which a policy has not been issued on the plan and premium rate originally applied for."

About a month before he filed this appiclation, the insured had applied for insurance in another company, which was declined because of location.   The trial Court refused a motion by the defendant for a directed verdict and charged the jury:

"That in order for company successfully to defend upon ground of false statements these must have been material and made by [the insured] with knowledge of their falsity and with a fraudulent purpose—that is, with intent to deceive."

Judgment for the plaintiff was reversed, the Court holding:

"Considered in most favorable light possible, the above-quoted incorrect statements in the application are material representations; and, nothing else appearing, if known to be untrue by assured when made, invalidate the policy without further proof of actual conscious design to defraud."

In *Baumann v. Insurance Co.,* 225 N. Y., 480; 122 N. E., 628, it is held (quoting syllabus) :

"A statement in an application for accident insurance that applicant had never been refused accident, health, or life insurance was a warranty, and, being untrue, there could be no recovery on the policy."

In *Goodbar v. Insurance Co.,* 89 W. Va., 221; 108 S. E., 896, it is held:

"The next ground of defense is that the insured represented that he had never applied for and been refused insurance in any other company. This representation is likewise one of fact, and is material, and if false will avoid the policy."

In *Maryland Co. v. Eddy,* 239 Fed., 477; 152 C. C. A., 355, the misrepresentation was that no similar insurance had been canceled. The Court said:

"Such a situation presents no question of fact for the jury; the materiality of such a statement is apparent as matter of law."

In *Ebner v. Insurance Co.,* 69 Ind. App., 32; 121 N. E., 315, it was held that a representation that the applicant had never applied for insurance was material to the risk.

In *Ætna Co. v. Moore,* 231 U. S., 543; 34 Sup. Ct., 186; 58 L. Ed., 356, it is held that a representation that the ap-

plicant for insurance had never been rejected by any company is material to the risk.

In *Jeffries v. Insurance*, 22 Wal., 47; 22 L. Ed., 833, it is held that any answer untrue in fact, and known by the applicant to be so, avoids the policy, irrespective of the question of the materiality of the answer to the risk.

In Hardy v. Insurance Co., 167 N. C., 22; 83 S. E., 5, it is held (quoting syllabus) :

"A representation by an applicant * * * that he had never been examined for insurance and rejected is material, and, if false, avoids the policy."

See also, *Aloe v. Ass'n*, 147 Mo., 561; 49 S. W., 553; note 55 L. R. A., 122.

The case of *Livingston v. Insurance Co.*, 120 S. C., 93; 112 S. E., 547, is distinguishable from the case at bar, in that in the Livingston Case there was not only a failure to allege and prove fraud, but a positive desclaimer on the part of the company of any intention to rely or charge it.

The judgment of this Court should be that the judgment of the Circuit Court be reversed, and that the cases be remanded to that Court for the purpose of rendering judgments in favor of the appellants under rule 27.