**PILOT LIFE INSURANCE COMPANY, Appellant,**

v.

**PULLIAM MOTOR COMPANY, Appellee.**

**No. 7108.**

United States Court of Appeals Fourth Circuit.

Argued Jan. 10, 1956.

Decided Feb. 15, 1956.

John W. Thomas, Columbia, S. C., and C. R. Wharton, Greensboro, N. C. (Alva M. Lumpkin, Thomas & Lumpkin, Columbia, S. C., and Wharton & Wharton, Greensboro, N. C., on brief), for appellant.

Isadore S. Bernstein, Columbia, S. C. (T. P. Taylor and C. T. Graydon, Columbia, S. C., on brief), for appellee.

Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.

DOBIE, Circuit Judge.

Pilot Life Insurance Company (hereinafter called Pilot) instituted a civil action in the United States District Court for the Eastern District of South Carolina, seeking to rescind and cancel a policy of life insurance on the ground that the insured gave false answers to some of the questions on his application for insurance. The District Court, sitting without a jury, found that these answers were not fraudulently made, dismissed Pilot's complaint, and ordered that judgment of $100,000 (the amount of the policy), plus interest from January 30, 1953, be entered for Pulliam Motor Company, the beneficiary of this policy, on its counterclaim. From this final judgment, Pilot has duly appealed to us.

The question before us is whether the District Court erred in failing to find and hold that Pilot was entitled to the cancellation and rescission of the policy on the ground of fraudulent representations contained in the application of Robert C. Pulliam, the insured. This involves the correctness of the Court's finding that Pulliam did not commit fraud in his answers to the questions on his application and whether, even if we assume such fraud, Pilot has waived the right to rescind and cancel this policy. We find no such error; the judgment of the District Court is affirmed.

The facts in this case are lengthy; we advert only to those that we feel are material. Pulliam died January 30, 1953, of a heart attack. Up to that date, Pulliam had served as president of Pulliam Motor Company, the beneficiary of two policies of insurance issued by Pilot on Pulliam's life, each in the amount of $100,000. The first was dated February 10, 1949; the second was dated February 9, 1952, and is the only one here contested by Pilot. Each policy was issued and accepted on the initiation and solicitation of Pilot, and each was issued on the basis of an accelerated premium.

The first policy was sold to Pulliam after T. K. Knight, Pilot's agent, convinced Pulliam that life insurance was the solution to his retirement plan. The chief selling point that Knight used was the income tax advantage.

After Pulliam agreed to apply for this first policy, Knight, before forwarding the application, inquired at Pilot's home office for information concerning Pulliam. The check revealed a record of Pulliam's having high blood pressure, as shown by a prior examination for the Mutual Life Insurance Company of New York, which had issued a policy to Pulliam on a rated basis but later re-issued it on a standard basis.

As found by the District Court:

"Knight thereupon sought information from Pulliam's personal physician, Dr. Charles Gordon Spivey, who, incidentally, was also one of plaintiff's medical examiners. Dr. Spivey gave Knight his entire record relating to the physical and health condition of Pulliam dating back to 1936. This record was sent to plaintiff along with Pulliam's application."

Pulliam was thereafter examined by both Doctors Allison and Spivey, Pilot's medical examiners. Pilot also required Dr. Spivey to submit an electrocardiogram and a six foot X-ray of the heart. Pilot then issued Policy No. 1, rated "Table B" because of Pulliam's "overweight and elevated blood pressure." At first Pulliam was reluctant to accept this policy at the higher premium and did so only after Agent Knight promised to make an effort to get Pilot to reduce the premium on the first anniversary of the policy. Pulliam refused to accept an additional policy for $25,000 which Pilot had issued without his knowledge.

On the first anniversary of this policy, Pilot agreed to re-issue this policy on a "Table A" rating, which is based on 25% extra mortality instead of the pre-

vious 50% under "Table B." This was done after and upon the basis of Dr. Spivey's re-examination of Pulliam. Pulliam still was not completely satisfied with the re-rating, and wanted the standard rate if possible.

This brings us to the second policy, which is the subject of this suit. In January, 1952, Agent Knight attempted to sell Pulliam another $100,000 policy, reasoning that by letting the company "put you through the mill," Pulliam might be able to get the standard rates on the prior policy and the contemplated new policy, since Pulliam's general health had improved during the past few years. Pulliam agreed.

The District Court found that:

· "On January 31, 1952, Knight had Pulliam examined by Dr. W. C. Abel. Dr. Abel found nothing irregular or abnormal. On Dr. Abel's report, it was disclosed that Pulliam had undergone a hemorrhoidectomy in April, 1951, by Dr. Benet, and that he had been hospitalized for a spasm of the esophagus by Doctors Spivey and Madden in April, 1951. When this information was later received by plaintiff, no further inquiry was made of either doctor about either of the mentioned conditions.

"On March 18, 1952, Knight had Pulliam examined by Dr. Spivey. On Dr. Spivey's report, it was disclosed that Pulliam had undergone a hemorrhoidectomy in 1951 by Dr. Benet and that he had been hospitalized for a pylorus spasm (no date given). On Dr. Spivey's confidential report, the following questions and answers appeared:

" 'Are you aware of any circumstances not disclosed above which might have an unfavorable bearing upon desirability of the risk? (Answer): History of changes in blood pressure on previous examination.'

" 'Is applicant in your judgment a desirable life insurance risk? (If unfavorable opinion is held, give reason for same) (Answer): During past year reading of B. P. has ranged from 150/90 to 138/86.'

"In addition to the routine examination, Dr. Spivey also made a special examination of the heart and an electrocardiogram and had an X-ray of the heart made by another doctor. The reports on all these examinations were submitted to plaintiff. On Dr. Spivey's report to plaintiff on the special examination of the heart, the following questions and answers appeared:

" 'Does examination reveal evidence of: * * * Arterio sclerosis? (Answer): No.

" 'Does applicant admit a history of having: (Give details under remarks) * * * Heart disease or treatment for heart trouble? (Answer): No.

\* \* \* \* \* \*

" 'Diagnosis of the case: (Answer): Variation in B. P.'

"The electrocardiogram which Dr. Spivey submitted showed some deviations from the prior electrocardiogram taken in 1949 which had been submitted to plaintiff along with Pulliam's application for the first policy. However, no additional inquiry was ever made as to this matter. * * *

"Two weeks thereafter, on April 3, 1952, the policy was issued and forwarded to Knight to secure Pulliam's acceptance of it, along with the following letter:

" 'We are issuing $100,000 Life Insurance coverage on the above named on our 20 Pay Participating Plan rated Table A.

" 'It is necessary that we charge this extra rating on account of the applicant's physical history.

" 'We certainly hope you will be successful in delivering this policy as issued.'

"Pulliam, at first, refused to accept the policy. However, Knight sold Pulliam on the idea that the pol-

icy was a good investment in spite of the rating. In doing this, Knight prepared a table of figures for Pulliam to look over. Pulliam agreed to consider it, but he again consulted his accountant for the purpose of having him examine the policy from a tax angle. The accountant approved the policy plan. The next day, Pulliam agreed to take the policy and gave Knight a check for the premium."

Pilot retained only $5,000 of the second policy, re-insured the balance, and submitted the entire file to the re-insurer. Thereafter, on January 30, 1953, Pulliam died of a heart attack.

We again quote from the opinion of the District Judge:

"Plaintiff is now contesting the validity of the second policy and bases its contention mainly upon the claim that Pulliam concealed the following facts:

"1. On October 8, 1949, at which time Pulliam was in Columbia Hospital under the care of Dr. Spivey as a result of an attack of gastritis, Pulliam was examined by Dr. Heyward Gibbes at Dr. Spivey's suggestion. Dr. Gibbes informed Pulliam that he had 'early symptoms of angina,' that he was a 'pre-hypertensive,' and that he had 'early arterio sclerosis.'

"2. On April 21, 1951, while Pulliam was in Columbia Hospital recuperating from a hemorrhoidectomy, he was examined by Dr. Emmett Madden at Dr. Spivey's suggestion. Dr. Madden informed Pulliam that he had coronary heart disease with coronary insufficiency.

"3. On April 25, 1951, the day that Pulliam was discharged from the hospital where he had undergone a hemorrhoidectomy, Pulliam consulted Dr. Henry J. Bayon in the latter's office as a result of an attack of pain in the chest.

"Plaintiff learned the above facts as a result of an investigation conducted after Pulliam's death, which investigation was evidently based on information in plaintiff's possession at the time the policy was issued.

"Dr. Spivey, being Pulliam's personal physician as well as plaintiff's medical examiner, knew that Pulliam had been examined by Doctors Gibbes and Madden. He himself had called them into consultation and, presumptively, knew as well or better than did Pulliam what their opinions were. He did not mention Dr. Gibbes' findings to plaintiff because he was of the opinion that they were within limits of normal for Pulliam's age. (Pulliam was 51 at that time.) In fact, Dr. Gibbes concluded that Pulliam was in very good health for his age. Dr. Spivey did not mention Dr. Madden's findings, evidently, because he was satisfied in his own mind that Pulliam did not have heart disease. Besides, plaintiff knew of Dr. Madden's examination of Pulliam and did not pursue that information until after Pulliam's death. There is nothing in the evidence to show that Pulliam thought he had heart disease when he applied for the policy in question. On the contrary, it appears that he, like the plaintiff, respected Dr. Spivey's opinion and believed what Dr. Spivey told him, to wit, that he did not have heart disease. The consultation with Dr. Bayon was not mentioned by anyone, but it was of no consequence. Dr. Bayon concluded that Pulliam's pains were not caused by heart trouble, and so advised Pulliam."

The District Court concluded that Pilot had fallen far short of the proof necessary for the rescission and cancellation of the policy in question, that not only did Pilot have sufficient information to be put on inquiry as to Pulliam's condition, but in addition, it was charged with knowledge of all facts known to its medical examiner, Dr. Spivey. On this appeal, Pilot contests each of these conclusions.

It is well accepted that the findings of fact made by the District Court, sitting without a jury, will not be set aside unless clearly erroneous. Here, the District Court's finding and conclusion that Pulliam did not commit fraud in his answers to the questions on the application are governed by the law of South Carolina. Pilot, in its action for rescission upon the ground of fraud, had five elements to prove, as noted recently by the South Carolina Supreme Court, and admitted now by Pilot. Lipsey v. Life Insurance Company of Georgia, 221 S.C. 291, 70 S.E.2d 349; Metropolitan Life Insurance Company v. Bates, 213 S. C. 269, 49 S.E.2d 201. That court, in the Lipsey case, 70 S.E.2d at page 351, thus stated the rule:

"It is sufficient to say that it is incumbent upon the insurer to show not only that the statements complained of were untrue but, in addition, 'that their falsity was known to the applicant, that they were material to the risk and relied on by the insurer, and that they were made with intent to deceive and defraud the company.' Johnson v. New York Life Insurance Co., 165 S. C. 494, 164 S.E. 175, 176."

In short, the insurer must prove fraud by evidence that is clear, cogent and convincing. Wingo v. New York Life Insurance Co., 155 S.C. 206, 101 S.E. 653.

The answers which Pilot complains of are to questions 7B, 7C, 7L and 8E of the application made by Pulliam to Dr. Abel January 31, 1952, and to Dr. Spivey on March 18, 1952.

These questions and answers were as follows:

"7. Have you ever suffered from any ailment or disease of: * * * B. The heart, lungs, pleura, or chest? (Answers): No. C. Have you had or been treated for high or low Blood Pressure? (Answers differed on each—"No" on one and "See note" on other. * * * L. Have you consulted a doctor for any cause not included in above answers? (Answers): No. 8. * * * E. Are you aware of any physical defect or have you had any complaint not mentioned above? (Give details') (Answers): No."

The District Court concluded that Pulliam answered truthfully the question pertaining to his heart since it called for an opinion and he himself believed that he had no such trouble. His view was fortified by the same strong belief and opinion of his regular family physician, Dr. Spivey. Dr. Bayon held a similar view, although Doctors Gibbes and Madden disagreed and had advised Pulliam to that effect.

As to the question relating to Pulliam's blood pressure, the District Court quite properly noted Pulliam's answer was inaccurate but that it could not have deceived Pilot since Pilot was otherwise fully advised of that condition. As to this and the prior question, Pilot was deemed to have waived the maladies, since it had sufficient information to put it on inquiry and yet had issued the policy on a rated basis.

The District Court concluded as to Questions 7L and 8E that Pulliam's negative answers were not intended to deceive or defraud Pilot and if answered correctly, would have disclosed only a consultation with Dr. Bayon, which was of no consequence, and that Pulliam had had attacks of indigestion, which also was of little significance.

As we view these questions and answers in the light of the evidence, Pulliam did not make a full and frank disclosure in all respects. The Company was entitled certainly to the information possessed by Doctors Gibbes and Madden. It is obvious, however, that Pulliam's answers were given with the strong reliance he placed upon the advice and opinion of the Company's Examiner, Dr. Spivey, and were made without intent on his part to be untruthful or to deceive or defraud the Company.

The District Court concluded that Pilot fell far short of the necessary

proof to rescind the policy of insurance on the ground of fraud. We find support for this conclusion from our consideration of all the circumstances and events surrounding the issuance of these insurance policies and from our review of the South Carolina law, especially Lipsey v. Life Insurance Company of Georgia, supra, and Wingo v. New York Life Insurance Company, supra.

More significant on the question of rescission of this policy and in fact determinative, we feel, is the abundant proof of waiver on the part of Pilot, through its own knowledge and actions and those of its medical examiner, Dr. Spivey. This is readily apparent when we consider the information Pilot had received to put it on inquiry as to whether or not Pulliam's heart was functioning normally.

As noted by the District Court:

"The electro-cardiogram of March 18, 1952, which plaintiff had, revealed abnormalities which should have aroused suspicion when considered along with the electro-cardiogram of February 16, 1949, which plaintiff also had. In addition, plaintiff had Dr. Spivey's medical report of February 21, 1950, revealing that Pulliam's heart beats were irregular. Plaintiff was also aware of Pulliam's history of high blood pressure extending over a period of fifteen years. These facts alone were sufficient to put plaintiff on inquiry. Plaintiff also knew that Pulliam had been hospitalized for a spasm of the esophagus (or pylorus spasm) and that such pains are similar to pains emanating for the heart. Although confronted with all these facts, plaintiff never made any further inquiry until after Pulliam's death and liability had arisen. It did not request Pulliam's hospital records nor any additional information from Dr. Madden, although plaintiff had notice that Dr. Madden had examined Pulliam. * * * The attitude of plaintiff is revealed by the fact that Pulliam's case was never re-

ferred to Plaintiff's medical director for an opinion although there was a total of $200,000.00 worth of insurance involved."

██ In South Carolina, it has been recognized that the insurer is deemed to have waived the right to rescind where it is apprised of sufficient facts to put it upon inquiry even though it does not have full knowledge of the applicant's condition. Abercrombie v. Pilot Life Insurance Company, 214 S.C. 350, 52 S.E.2d 400. This law is applicable rather than our opinion, cited by Pilot, of Provident Life & Accident Insurance Co. v. Hawley, 4 Cir., 123 F.2d 479, which arose in North Carolina and takes a less liberal view.

The real key to the question of waiver, however, lies with Dr. Spivey. He was a physician of good standing and reputation in his community and was well respected. At the time of the trial of the issues below, Dr. Spivey had been Pilot's examining physician for approximately twenty-two years and was the Medical Director for the Carolina Life Insurance Company of Columbia. Further, Dr. Spivey had been Pulliam's family physician, was thoroughly familiar with his physical history since 1936, and had submitted to Pilot for its inspection his personal files on Pulliam, covering the period from 1936 to the date of Pulliam's first application for insurance. The evidence disclosed a thorough knowledge on Dr. Spivey's part of the information which, it is complained, was not given to Pilot by Pulliam. In fact, as noted by the District Court: "Dr. Spivey knew as much about Pulliam's health as did Pulliam himself, if indeed he did not know more about it."

██ Under South Carolina law, in the absence of evidence of fraudulent collusion between Dr. Spivey and Pulliam or of fraud by Dr. Spivey which was participated in by Pulliam, Pilot is charged with knowledge of all facts known to its Medical Examiner, Dr. Spivey. See, Mickle v. Dixie Security Life Insurance Company, 216 S.C. 168, 57 S.E.2d 73;

Evans v. Sovereign Camp, W. O. W., 189 S.C. 247, 200 S.E. 850; Able v. Pilot Life Insurance Company, 186 S.C. 26, 194 S. E. 628; Ayers v. Business Men's Insurance Company, 148 S.C. 355, 146 S. E. 147; Southeastern Life Insurance Company v. Palmer, 129 S.C. 432, 124 S.E. 577.

Our review of the record fails to disclose evidence of collusion between Pulliam and Dr. Spivey or of fraud by Dr. Spivey, participated in by Pulliam, nor was this contended before the District Court. Of course, if Dr. Spivey had been colluding with Pulliam in perpetrating a fraud upon the company, the latter would not be chargeable with his knowledge, McSweeney v. Prudential Life Insurance Company, 4 Cir., 128 F. 2d 660; but no such collusion is charged in the pleadings or established by the proofs and we clearly would not be justified in disregarding the finding of the trial judge to the contrary.

We feel that Reese v. Woodmen of World Life Insurance Society, 221 S.C. 193, 69 S.E.2d 919, relied upon by Pilot, is readily distinguishable and not applicable to the case before us.

We conclude that the critical findings and conclusions of the District Court were not clearly erroneous and that the judgment of that court must be affirmed.

Affirmed.