254 F.2d 30
 NATIONWIDE LIFE INSURANCE COMPANY, Appellant,
v.
Mrs. Emmie T. ATTAWAY and John D. Attaway, III, a minor under the age of 14 years, by his Guardian ad Litem, John D. Attaway, Jr., Appellees.
 No. 7538.
 United States Court of Appeals Fourth Circuit.
 Argued January 14, 1958.
 Decided April 2, 1958.
 
 J. D. Todd, Jr., and Fletcher C. Mann, Greenville, S. C. (Wesley M. Walker, Greenville, S. C., on the brief), for appellant.
 John K. Grisso, Anderson, S. C., for appellees.
 Before SOPER, SOBELOFF and HAYNSWORTH, Circuit Judges.
 SOPER, Circuit Judge.
 
 
 1
 This suit is brought by the beneficiaries of an insurance policy on the life of John D. Attaway of Williamston, South Carolina, who died at the age of 45 on February 4, 1954, as the result of a thrombosis of the coronary artery. The policy had been issued by the Nationwide Life Insurance Company on January 6, 1954, and delivered to the insured on January 15, 1954. The insurance company defended the suit on the ground that Attaway and Dr. O. M. Goodlett, Jr., the examining physician of the company, who was also Attaway's personal physician, made false and fraudulent representations with regard to Attaway's medical history in the application for the policy. Upon the conclusion of the testimony in the District Court, the defendant moved for a directed verdict for the plaintiff in the sum of $42.50, the amount of the premium paid, but the motion was denied and the case was submitted to the jury with a charge by the District Judge to which appropriate exceptions were taken by the defendant. The jury rendered a verdict for $11,830.70, the full amount claimed by the beneficiaries. A subsequent motion by the defendant for a judgment n. o. v., in accordance with the motion previously made, was overruled and this appeal followed.
 
 
 2
 In answer to certain questions in the application in respect to his medical history, Attaway made the following statements amongst others:
 
 
 3
 "Q. Have you ever had vertigo or dizzy spells? A. No.
 
 
 4
 "Q. State every physician or practitioner whom you have consulted, or who has treated you, during the past five years. If none, so state. A. O. M. Goodlett, Pelzer, S. C., September, 1953, acute upper resp. infection — Good.
 
 
 5
 "Q. Have you ever raised or spat blood? A. No.
 
 
 6
 "Q. Have you ever been treated for, or to the best of your knowledge and belief, ever had any disease or disturbance of: (Answer each separately) The stomach, liver, intestines, kidney or bladder? A. Yes, appendectomy, 1934.
 
 
 7
 "The rectum (hemorrhoids, fistula, etc.)
 
 
 8
 "A. No.
 
 
 9
 "Q. Have you ever had any other illness, injury or operation not mentioned elsewhere? A. No."
 
 
 10
 Dr. Goodlett, in answer to certain questions, made the written statement that after careful inquiry and examination of the applicant he found no abnormality and that he did not know anything in connection with the physical condition or past history of the applicant not detailed in the application which would affect his insurability except that his blood pressure was then systolic 148 and diastolic 88 and that he had had a slight elevation of blood pressure for 15 years.
 
 
 11
 The uncontradicted evidence shows that, prior to the application for the policy, Attaway had frequently consulted Dr. Goodlett, who had been his personal physician since 1938, in regard to his health, and on certain occasions had been sent by Dr. Goodlett for examination to other physicians who reported their findings to Dr. Goodlett. Thus on February 1, 1943, Attaway was examined by Dr. Gertrude Holmes, one of these physicians, who at that time was associated in practice with Dr. Hugh Smith of Greenville, South Carolina. She found, as shown by her records, that Attaway was suffering from facial paralysis, with which he had been stricken on January 20, 1943. Since then it had cleared up considerably and she diagnosed it as Bell's palsy. He also complained of pains in his legs and arms, shortness of breath, and occasional pains in the epigastrium (the region just below the breast bone) for which he had taken nitroglycerin. His blood pressure was labile but within normal limits and his heart appeared to be normal.
 
 
 12
 On September 13, 1943, Attaway returned to Dr. Holmes for further examination, complaining of lack of energy, gaseous indigestion, pains in the epigastrium radiating into the right arm, and headaches for which he found relief in a tablet prescribed by Dr. Goodlett, which he believed to be nitroglycerin. These symptoms suggested angina pectoris but this was not mentioned to him. The heart sounds were clear and of good quality. He was advised to take aminophyllin, which increased the blood supply to the heart.
 
 
 13
 On September 27, 1943, Attaway again saw Dr. Holmes, complaining of bleeding from the rectum and daily headaches in the morning. The doctor concluded that he was suffering from an irritated colon and diverticulitis.
 
 
 14
 On November 1, 1943, Attaway returned again to Dr. Holmes and reported that the day before he had suffered another attack of facial paralysis, less severe than the previous one, and also that he had suffered rectal bleeding and substernal pains leading into the arms. The doctor concluded that the patient was suffering from spasm of the blood vessels, which may have caused the facial paralysis. At the request of Attaway, she wrote a letter to his draft board. She reported to Dr. Goodlett that Attaway was "undoubtedly having a good deal of vascular disturbance". The patient had been sent to Dr. Holmes by Dr. Goodlett, to whom Dr. Holmes made a report of all her findings.
 
 
 15
 On a number of occasions, between October 13 and December 17, 1954, Dr. Hugh Smith examined Attaway at the request of Dr. Goodlett. The patient complained of episodes of nausea and vomiting during the previous six years and also a pain in the gall bladder area, for which Dr. Goodlett had been treating him off and on. Dr. Smith concluded that Attaway was suffering from an allergy or gall bladder disease. He did not find a heart condition. He reported his findings to Dr. Goodlett.
 
 
 16
 The insurance company did not learn of the previous illnesses of Attaway or his visits to Dr. Holmes and Dr. Smith until March 1954, after Attaway's death when the proofs of death were filed. The uncontradicted testimony of Dr. Donald E. Yochem, medical director of the insurance company, was that the statements contained in the application hereinbefore referred to with respect to the medical history of the insured were material to the risk and that if the facts as detailed in the testimony of Dr. Holmes and Dr. Smith had been made known to the company the policy would not have been issued. He explained that the symptoms of Bell's palsy, dizziness, nausea, and substernal pain when associated with high blood pressure, and the prescriptions of nitroglycerin and aminophyllin, which are specifics for diseases of the heart, were strong indications of a dangerous condition and that if they had been made known to the company the issuance of the policy would not have been approved. This testimony was corroborated by that of Allen C. Palmer, who approved the issuance of the insurance in his capacity as underwriter for the company. He said that he approved the application upon a higher rating or special class premium because of the elevated blood pressure, but that if the facts disclosed in the testimony of Dr. Holmes and Dr. Smith had been set out in the application he would have been without authority under standard underwriting procedures to issue the policy and the application would have been rejected. The testimony of Dr. Yochem and Mr. Palmer was not contradicted.
 
 
 17
 Dr. Goodlett was called as a witness for the defendant to prove the execution of the application. He testified that he had no recollection that he had ever acted as examining physician for the company in any other case. He identified his and Attaway's signatures to the application and said that Attaway made the answers therein contained and that they were true to the best of his knowledge, except that he could not remember whether or not Attaway's visits to Dr. Smith occurred within the five-year period. He also testified that he had sent Attaway to the doctors and that he had their reports in his files, and also that he was aware of the complaints of Attaway and of the findings of the physicians therein set out. He did not remember whether he had ever prescribed nitroglycerin or aminophyllin for the patient. He did not know or suspect that Attaway had heart disease prior to the autopsy but only that he had high blood pressure. He had found that Attaway was suffering pain in the substernal area on January 18, 1954, and thinking that the trouble was with the gall bladder, sent him to the Greenville Hospital under the care of Dr. Hugh Smith.
 
 
 18
 Upon this evidence the Judge charged the jury that in order to prevail in its defense the company must show (1) that the representations in the application were false to the knowledge of the insured; (2) that they were made with intent to deceive and defraud; (3) that they were material; and (4) that the company relied upon them. This was a correct statement of the law of South Carolina on the point. See Johnson v. New York Life Ins. Co., 165 S.C. 494, 164 S.E. 175.
 
 
 19
 The jury, however, were also told that the false answers in the application did not constitute a defense if the company knew of their falsity when it issued the policy; and that the company was charged with knowledge of all the facts known to Dr. Goodlett in the absence of fraudulent collusion between him and the insured; and that the doctor knew all the facts concerning Attaway's medical history and that there was no evidence in the case of fraudulent collusion between the two men.
 
 
 20
 Thus far the charge amounted, in effect, to a binding instruction to the jury to find a verdict for the plaintiffs. It is true that the jury were also told that they were the sole judges of the facts and the credibility of the witnesses, but there was no explicit instruction that they were at liberty to disregard any expression of opinion on the part of the judge as to the weight of the evidence.
 
 
 21
 Later in the charge, at the request of the defendant, the jury were instructed that the filling out of the application containing admittedly false answers by Dr. Goodlett was evidence of one of two things: either that he did not have the information in mind as to what the correct answers should be or that he participated in the false answers, in which case the company would not be bound by the knowledge that he possessed. The jury, however, were admonished that they must take this instruction in connection with all other matters previously mentioned in the charge and, also, that there would be no fraud on the part of Dr. Goodlett if he thought that the false statements in the application were so trivial as to be immaterial and unworthy of notice.
 
 
 22
 In our judgment the submission of the case to the jury under this charge was error. The positive statement of the Judge that there was no evidence of fraud on the part of Dr. Goodlett was not justified and was clearly prejudicial to the defendant. Under the circumstances the error would not have been cured even if the jury had been told that they were at liberty to ignore the Judge's appraisal of the facts. During the period covered by the medical history Dr. Goodlett considered Attaway's condition sufficiently serious to send him on a number of occasions to more experienced physicians for examination and treatment. From them he received detailed reports and kept the reports in his files, and he testified that he was familiar with their contents. If he had them in mind when he signed the application, his approval of the risk constituted cogent evidence of fraud on his part. He had no justification for withholding the truth from the company on the ground suggested by the Judge that the misstatements were not material. Neither he nor any other witness ventured the opinion that the false statements related to immaterial matters. On the contrary, the uncontradicted evidence was that Attaway's previous illnesses were so suggestive of a dangerous physical condition that the policy would not have been issued if the underwriters had been told the truth. Hence the present case does not fall within the group of South Carolina decisions in which an undisclosed ailment of an applicant for insurance was held to be so slight as to be immaterial, such as Mickle v. Dixie Security Life Ins. Co., 216 S.C. 168, 57 S.E. 2d 73 (periodic insobriety), or in which the evidence on the point of materiality was conflicting, as in Wingo v. New York Life Ins. Co., 112 S.C. 139, 99 S.E. 436 and Metropolitan Life Ins. Co. v. Bates, 213 S.C. 269, 49 S.E.2d 201, so as to become a jury question.[1]
 
 
 23
 The case should have been disposed of by granting the motion of the defendant for a directed verdict in favor of the plaintiffs for the amount of the premium paid. The only reasonable conclusion from the evidence is that the insured intended to deceive and defraud the company when he deliberately suppressed the truth and gave the false answers as to his prior medical treatments, of which he had full knowledge. The case is very similar to Reese v. Woodmen of World Life Ins. Society, 221 S.C. 193, 203, 69 S.E.2d 919, 923, where the insured in his application denied having had any recent contacts with physicians although he had been treated on several occasions for what his doctor thought was acute indigestion but was actually a disease of the heart. The Supreme Court of the State affirmed a directed verdict for the defendant, saying that:
 
 
 24
 "5. The result of this case is not dependent upon the existence of the serious heart disease of the deceased, and his knowledge of it, but is governed by his failure to disclose the medical attention which he had received, and was receiving, for the physical condition which occasioned his repeated consultations with physicians. Common honesty required disclosure, aside from the express contractual terms of the application, * * *."
 
 
 25
 In Suggs v. New York Life Ins. Co., 174 S.C. 1, 176 S.E. 457, the Court reached a contrary conclusion under somewhat similar circumstances. We follow the later decision for the reason quoted above from its text.
 
 
 26
 The plaintiffs make the additional contention that even if Attaway was guilty of fraud, the company is bound because it issued the policy with knowledge of the facts obtained by its agent, the examining physician. The law in South Carolina in respect to such a situation is settled by decisions of the Supreme Court of the State which we have had occasion to consider in prior cases. If an insurance company issues a life policy with knowledge that the insured has misrepresented his physical condition and is in fact not in good health, the company is deemed to have waived the right to object and is bound by its contract; and in such case the knowledge of an agent of the company, who is aware of the misrepresentation, is imputed to it, unless it is shown that the agent as well as the insured was guilty of fraud. The agent's knowledge, however, is not imputed to the company unless it was acquired during the period of his agency, or, if previously acquired, unless the agent had the information in mind when he undertook to act for the company in the issuance of the policy. In Aiken Petroleum Co. v. National Petroleum Underwriters, 207 S.C. 236, 248, 36 S.E.2d 380, 385, the Court said that "knowledge of an agent acquired prior to the existence of the agency may be chargeable to the principal [only] if it is clearly shown that the agent, while acting for the principal in a transaction to which the information is material, has the information present in his mind, or where it was acquired so recently or under such circumstances, that it will be presumed to have been in his mind and memory at the time of the transaction in question; * * *."
 
 
 27
 Dr. Goodlett had not acted as agent of the company prior to the application of the policy in suit, and hence he was not the company's agent when he acquired information as to Attaway's physical condition from his prior examinations and the findings of the other physicians. It may however be fairly inferred from the evidence, as shown above, that he had this information in mind when he approved the risk. If this view is accepted, it would not avail the plaintiffs, for it would demonstrate that the agent of the company, as well as the applicant, was guilty of fraud and the contract of insurance would be invalid. On the other hand, if it be supposed that Dr. Goodlett did not remember the details of the medical history when he approved the application, the plaintiffs' case would also fail, for in such event the company would have had no knowledge of the falsity of the answers.
 
 
 28
 We have had occasion to consider similar questions under the law of South Carolina in Pilot Life Ins. Co. v. Pulliam Motor Co., 4 Cir., 229 F.2d 912, and McSweeney v. Prudential Ins. Co., 4 Cir., 128 F.2d 660. In the first mentioned case the examining physician had been the family physician of the insured for sixteen years and the company's representative for twenty-two years. He had kept complete records of the applicant's case and had turned them all over to the insurance company; but in filling out the answers in the application he failed to mention two previous diagnoses of heart disease. In a suit for cancellation we held that the company was bound by its contract since the complete disclosure by the physician overcame any inference of collusive fraud and that the doctor's knowledge was imputable to the company.
 
 
 29
 In the McSweeney case the decision was for the company. The applicant's personal physician acted for the first time as examining physician for the company and the application failed to mention earlier heart attacks, of which the doctor had records. The case was referred for findings to a master who reached the conclusion, adopted by the trial judge, that there was no evidence that the doctor had these illnesses in mind when he approved the application. In affirming the judgment, the Court said (at page 664):
 
 
 30
 "We approve the finding of the master, confirmed by the District Judge, to the effect that, at the time of Dr. Boyd's examination of the insured, he did not have in mind the information furnished him by Dr. Levy more than two years before, and that the company is not chargeable therewith. In view of the high character of Dr. Boyd and the many matters demanding his attention, it is reasonable to assume that he did not have in mind, when writing down the answers of the insured, information which showed the answers to be false. If he did not, the company is not chargeable with notice with regard thereto. In South Carolina the rule that knowledge or notice on the part of the agent is treated as notice to the principal is based on the duty of the agent to communicate all material information to the principal and the presumption that he has done so. Knobelock v. Germania Savings Bank, 50 S.C. 259, 27 S.E. 962. And where this rule prevails, it is well settled that `generally speaking, a principal is chargeable with knowledge which his agent acquired before the commencement of the relationship only when that knowledge can reasonably be said to be present in the mind of the agent while acting for the principal, or where he had acquired it so recently as to raise the presumption that he still retained it in mind.' 2 Am.Jr. 294; In re Distilled Spirits, 11 Wall. 356, 20 L. Ed. 167; notes 4 A.L.R. 1615, 38 A. L.R. 823.
 
 
 31
 "A finding that Dr. Boyd had in mind the facts showing that the answers in the application were false would make him a party to the fraud practiced on the company; and, in such case, the company would not be charged with his knowledge. 2 Am. Jr. 299; Keeton v. Jefferson Standard Life Ins. Co., 4 Cir., 5 F.2d 183, 187; Zeidel v. Connecticut General Life Ins. Co., D.C., 44 F.2d 843."
 
 
 32
 In the pending case the result would be the same whether Dr. Goodlett had the facts in mind and became party to the fraud or did not have them in mind when he approved the risk, for in either case the company would not be charged with knowledge of the truth and could not be held to have waived the right to deny liability. The judgment of the District Court will therefor be reversed and the case remanded with directions to enter judgment for the defendant.
 
 
 33
 Reversed and remanded.
 
 
 
 Notes:
 
 
 [1]
 For other South Carolina decisions bearing on the question of materiality see Rogers v. Atlantic Life Ins. Co., 135 S.C. 89, 133 S.E. 215, 45 A.L.R. 1172; McLester v. Metropolitan Life Ins. Co., 175 S.C. 425, 179 S.E. 490; Robinson v. Pilgrim Health & Life Ins. Co., 216 S.C. 141, 57 S.E.2d 60